ALABAMA CENTRAL CREDIT
UNION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 83–G–2957–S.

United States District Court,
N.D. Alabama, S.D.

Aug. 14, 1986.

Dan W. McCoy, Jack M. Pate and C. Stephen Trimmier, Trimmier & Pate, Birmingham, Ala., for plaintiff.

Frank W. Donaldson, U.S. Atty. and Caryl P. Privett, Ass't U.S. Atty., Birmingham, Ala., Michael J. King, U.S. Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

This is a civil tax suit in which the plaintiff, Alabama Central Credit Union, is seeking to recover from the defendant, United States of America, a refund in the amount of $26,492.66, for federal income taxes paid with respect to the 1977 tax year. The facts are undisputed.

*Questions presented:*

1. Whether securities purchased on margin or with borrowed funds constitute debt-financed property within the meaning of Section 514 of the Internal Revenue Code, so that the income derived from the debt-financed portion of the securities is taxable as unrelated business income under Section 511 of the Internal Revenue Code.

2. Whether this court has jurisdiction over this action to the extent that the plaintiff seeks a refund of taxes paid on income derived from servicing cancer and group life insurance programs.

*Statutes involved:*

The pertinent statutes are set forth in the appendix, *infra.*

*Findings of fact:*

The parties have agreed to submit this case to the court for decision based upon a record consisting of a stipulation of facts, the deposition of William Edward Jordan, the defendant's written discovery and the plaintiff's responses thereto, and the pleadings and orders filed herein. Unless otherwise indicated, the facts set forth in the following statement have been taken from the stipulation of facts filed on December 30, 1985, and the plaintiff's responses to the defendant's request for admissions.

The plaintiff, Alabama Central Credit Union (hereinafter "ACCU"), is a credit union chartered and operating pursuant to the provisions of Code of Alabama (1975), §§ 5–17–1, *et seq.* ACCU's membership presently includes individual officers, directors and employees of other credit unions, as well as former members of the Teamster Credit Union. Prior to 1980, ACCU's membership also included other corporate credit unions. Pursuant to the Monetary Control Act of 1980, 12 U.S.C. §§ 226, *et seq.*, ACCU was required to spin off its corporate business and establish a separate organization, Alabama Corporate Credit Union, to service its corporate credit union members.

ACCU is an organization exempt from federal taxation pursuant to Sections 501(a) and 501(c)(14)(A) of the Internal Revenue Code of 1954 (26 U.S.C.).[1] The purposes or functions constituting the basis for ACCU's exemption under Sections 501(a) and 501(c)(14)(A) are to: (1) promote thrift among its members; and (2) create a source of credit for its members at legitimate rates of interest.

On October 28, 1976, ACCU purchased Government of Israel bonds at a total purchase price of $5,760,273.97. ACCU paid $510,273.97 in cash for these bonds and borrowed the remaining $5,250,000.00. ACCU pledged the bonds as security for the loan. During the period from January 1, 1977, through July 20, 1977, ACCU earned $244,648.44 as interest on the bonds. The interest expense incurred on the debt associated with the bonds was $78,435.77.

On July 20, 1977, ACCU sold the Government of Israel bonds at a gain of $28,798.68 and purchased, on margin, construction loan certificates guaranteed by the Government National Mortgage Association (hereinafter "GNMA"). The GNMA certificates earned interest during 1977 in the aggregate amount of $101,492.58. The interest expense incurred during 1977 on the debt associated with the GNMA certificates was $52,940.41.

In addition to income from transactions in the aforementioned securities, ACCU earned income, in the form of commissions, for servicing cancer and group life insurance policies during the 1977 tax year.[2]

The Internal Revenue Service (hereinafter "the Service") audited ACCU for the 1977 and 1978 tax years. As a result of this audit, the Service determined that $83,302.85 received by ACCU from its transactions in the Government of Israel bonds and the GNMA certificates was income from debt-financed property within the meaning of Section 514, and thus taxable as unrelated business income under Section 511.[3] The Service also determined that

---

1. Unless otherwise indicated, all subsequent references to Section shall be to the Internal Revenue Code of 1954 (26 U.S.C.).

2. ACCU denied that it earned income for servicing cancer and group life insurance policies in its response to the defendant's request for admissions no. 8. Nevertheless, because ACCU's response was untimely, the court deemed this request admitted in its order entered May 24, 1985.

3. The manner in which the Service calculated ACCU's taxable income and resulting tax liability is set forth on the third and fourth pages of the Notice of Deficiency, a copy of which is attached as Exhibit A to the stipulation of facts. If one adds the total amount of interest and profit received from the subject bonds, less the debt associated with the bonds, the total profit received by ACCU from trading in these bonds was $243,563.52. The Internal Revenue Service determined that only $83,302.85 of this profit was income from debt-financed property. The Service's figure is probably low. Nevertheless, ACCU has not disputed the accuracy of the Service's calculations. Instead, it challenges the

$1,015.20 received by the plaintiff in the form of commissions for servicing cancer and group life insurance programs constituted unrelated business income under Section 511.

As a result of this audit, the Service assessed a deficiency in the amount of $26,-492.66 against the plaintiff for the 1977 tax year.[4] The plaintiff paid the deficiency, filed a claim for refund which was denied, and instituted this suit.

The income and subsequent tax liability attributable to the insurance policy commissions are relatively insignificant. The predominant issue in this case is whether the securities purchased on margin with borrowed funds constitute debt-financed property within the meaning of Section 514, so that the income derived from the debt-financed portion of the securities is taxable under Section 511 of the Code. William Edward Jordan, president of ACCU, testified in his deposition that he purchased the subject securities on margin and with borrowed funds in order to increase the yield or income from the securities.[5] ACCU has stipulated that it has not purchased any securities on margin or with borrowed funds since 1977.

*Conclusions of law:*

Section 501(c)(14)(A) of the Code exempts from federal income taxation "credit unions without capital stock organized and operated for mutual purposes without profit." There is no dispute that ACCU is tax exempt under these provisions.

Section 511 of the Code imposes a tax on the unrelated business income, as defined in Section 512, of exempt organizations.[6] As a general rule, Section 512 does not tax passive investment income, such as interest, dividends and royalties, received by

exempt organizations. Section 512(b)(1), (2), (3), (5). If, however, such investment income is derived from "debt-financed property," as defined in Section 514, the income therefrom is taxed as unrelated business income. Section 512(b)(4).

The principal question presented in this case is whether the securities purchased on margin and with borrowed funds, hereinafter referred to as debt-financed securities, are debt-financed property. Section 514(b)(1) of the Code defines debt-financed property as property held to produce income with respect to which there is an "acquisition indebtedness," at any time during the taxable year.[7] Section 514(c), in turn, provides that acquisition indebtedness means the unpaid amount of indebtedness incurred by the exempt taxpayer in acquiring such debt-financed property. Acquisition indebtedness, however, does not include indebtedness whose incurrence is inherent in the performance of the taxpayer's exempt purpose. Section 514(c)(4). Further, debt-financed property does not include property "substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance of such organization of its ... [exempt purpose]." Section 514(b)(1)(A)(i).

The Government's position in this case is that when ACCU purchased the subject debt-financed securities, it incurred "acquisition indebtedness" with respect to those securities. Accordingly, the securities are debt-financed property within the meaning of Section 514(b)(1), and the income derived therefrom is taxable as unrelated business income.

Service's determination that the securities are debt-financed property.

**4.** The Service did not make any assessments against ACCU with respect to the 1978 tax year.

**5.** *See also* pages 12–14, *infra.*

**6.** Sections 511, 512 and 514 of the Internal Revenue Code are reproduced in the Appendix attached hereto.

**7.** Property disposed of during the taxable year is also debt-financed property if there was an acquisition indebtedness with respect to the property at any time during the 12–month period ending with the date of such disposition. Section 514(b)(1) of the Code.

ACCU filed an administrative protest of the findings of the Internal Revenue Service audit. In this protest, ACCU argued that the indebtedness incurred in the purchase of the securities was not acquisition indebtedness because its incurrence is inherent in the performance of its exempt function and thereby falls within the exception of Section 514(c)(4). ACCU further argued that the securities are not debt-financed property because substantially all the use of the securities is substantially related to the plaintiff's performance of its exempt purpose. In making this argument, ACCU relies upon the exception to the definition of debt-financed property embodied in Section 514(b)(1)(A)(i) of the Code.

As noted above, the income of such credit unions, including the investment income that is not derived from debt-financed property, is generally exempt from federal income taxation. It is clear that ACCU is permitted to purchase securities on margin without losing this favored tax status. Rev.Rul. 71–311, 1971–2 Cum.Bull. 184. The only requirement is that a tax be paid upon the income derived from such purchases. By purchasing debt-financed securities, ACCU does not lose its status as a tax-exempt organization and the other benefits attendant thereto. Rather, all that occurs upon the realization of unrelated business income is that such income is subject to taxation under Section 511 of the Code.

A primary legislative purpose for enacting the unrelated business income tax was to eliminate the unfair competitive advantage of exempt organizations. This legislative objective of preventing unfair competition included the objective of preventing exempt organizations from expanding their operations with tax-free profits, while their taxpaying competitors could expand only with profits remaining after taxes. *C.F. Mueller Co. v. Commissioner*, 479 F.2d 678, 682 n. 7 (3 Cir.1973).[8]

Analysis of the issues presented herein must begin with an examination of the purposes or functions constituting the basis for ACCU's exemption from federal income tax. As stated, the parties have stipulated that the purposes or functions constituting the basis for ACCU's exemption under Sections 501(a) and 501(c)(14)(A) are to: (1) promote thrift among its members; and (2) create a source of credit for its members at legitimate rates of interest.

■ The purchase of securities on margin and with borrowed funds is not "inherent" in the performance or exercise of a credit union's purpose or function. As noted above, in order for the securities in question to be debt-financed property, they must be subject to "acquisition indebted-

---

**8.** The unrelated business income tax was first enacted with the Revenue Act of 1950, c. 994, 64 Stat. 906. The specific provisions at issue in this case were added by the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487. In 1965, the Treasury Department submitted to Congress its Report on Private Foundations (Committee Print 1965, 89th Cong., 1st Sess., pp. 30, 45–52), in which it recommended the prohibition of all borrowing for investment purposes by tax-exempt organizations in order to ensure that such organizations invested only funds that had been contributed or the income produced by contributed funds. The Treasury noted that allowing unbridled borrowing by tax-exempt organizations for investment purposes would have some "unfortunate consequences," including the shifting of productive property to the exempt sector, which, in turn, would result in an erosion of the tax base as well as broad economic and social changes attendant to removing the ownership of businesses from the traditional business community. Statement of Stanley S. Surrey, Assist-

ant Secretary of the Treasury, reprinted in House Hearings before the Committee on Ways and Means on related Debt-Financed income of tax-exempt organizations, 89th Cong., 2d Sess., pp. 19–25. (This statement is also reproduced in 339 Tax Management, *Unrelated Debt-Financed Income*, Worksheet 1, p. B–3). In the following year, the predecessor of the debt-financed income provisions that were finally enacted was introduced in the form of identical bills H.R. 15942 and H.R. 15943. A year later, revised versions of the bills, H.R. 12663 and H.R. 12664, were introduced, which, with minor changes, ultimately resulted in the provisions enacted by the Tax Reform Act of 1969. *See* Beller, *Exempt Organizations: Taxation of Debt-Financed Income*, 24 Tax Lawyer, 489, 489–299 (1971), for a more detailed discussion of the history of the debt-financed income provisions. *See also Clarence LaBelle Post No. 217 v. United States*, 580 F.2d 270 (8th Cir.1978), which recognizes that an original purpose of the unrelated business income tax was to raise revenue.

ness." Section 514(b)(1) of the Code. As is relevant here, Section 514(c)(1)(A) of the Code defines acquisition indebtedness to mean the unpaid amount of indebtedness incurred by an exempt organization in acquiring debt-financed property. ACCU has admitted that the GNMA certificates were purchased on margin and that approximately ninety per cent of the purchase price of the Government of Israel bonds was financed with borrowed funds.[9] It is, therefore, undisputed that ACCU incurred indebtedness in purchasing the securities.

ACCU, however, contended in its protest letter that this indebtedness is not acquisition indebtedness because it falls within the exception of Section 514(c)(4) of the Code, which provides:

> *Indebtedness incurred in performing exempt purpose.*—For purposes of this section, the term "acquisition indebtedness" does not include indebtedness the incurrence of which is inherent in the performance or exercise of the purpose or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in section 501(c)(14) in accepting deposits of its members.

The Service properly rejected this argument. The example of inherent indebtedness set forth in the statute is not applicable to the issues in this case. The statutory example relates to the indebtedness which arises when a member makes a deposit in a credit union account. That indebtedness is clearly inherent to the ACCU's function as a credit union because these deposits form the source of ACCU's capital.[10] ACCU uses the deposited funds to make loans to other members "at legitimate rates of interest," thus effectuating the purpose for which it was granted tax-exempt status.

The acquisition of indebtedness in the purchase of securities, however, is not inherent to the performance of ACCU's tax-

exempt function. In a similar case, the Third Circuit defined "inherent" as it is used in Section 514(c)(4) as meaning "essential." *Elliot Knitwear Profit Sharing Plan v. C.I.R.*, 614 F.2d 347, 349–50 (3d Cir.1980). ACCU has stipulated that it has not purchased any securities on margin or purchased any securities with borrowed funds since 1977. In his deposition, the president of ACCU admitted that ACCU has been in good financial condition since 1977. Given that ACCU has been operating consistently well since its last purchase of debt-financed securities in 1977, its argument that the purchase of securities on margin or with borrowed funds is essential to the performance of its tax-exempt function is clearly without merit.

The purchase of securities on margin and with borrowed funds in order to maximize the yield or income therefrom does not constitute a purchase of property substantially related to the debtor's tax-exempt function. Section 514(b)(1)(A)(i) of the Code excludes from the definition of debt-financed property—

> any property substantially all the use of which is substantially related (aside from the needs of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under Section 501....

Analysis of this issue must begin with an examination of the purpose or function constituting the basis of ACCU's tax-exempt status and a review of ACCU's purpose in purchasing the debt-financed securities. As stated, the parties have stipulated that the purposes or functions constituting the basis for ACCU's tax-exempt status are to: (1) promote thrift among its members; and (2) create a source of credit for its members at legitimate rates of interest.

---

**9.** See ACCU's Response to the Government's Request for Admissions.

**10.** In his deposition, William Edward Jordan, president of ACCU, stated that all of ACCU's

capital came from deposits made by members to savings accounts maintained with ACCU. (Dep. 15.)

The president of ACCU made the decision to purchase the subject debt-financed securities. He explained his purpose for purchasing the securities on margin and with borrowed funds in the following excerpt from his deposition:

(Mr. King)

Q. When you were discussing earlier your current investments you told me that the purpose for making your current investments or your purpose for investing in securities and CD's that you are presently investing in was safety, the yield, interest or income—

(Mr. Jordan)

A. And soundness.

Q. —and soundness,—

A. Liquidity.

Q. —source of borrowing and liquidity.

A. Yes.

Q. Did you have a similar purpose for investing in these securities, the "Ginny Mae's" (GNMA) and Israeli bonds?

A. Yeah. Well, at the time, you know, the reason I went into those bonds is that the money that I borrowed on the other side to get those bonds with or buy those bonds, the interest rate that I was paying on the bonds, you know, for the borrowed money, was less than the return that the bonds were paying. In other words, I picked up a positive spread to improve, you know, my yield, to improve the income that I would have coming in, to improve the dividends that I could pay, you know, on the accounts that I would have and help pay for expenses and what have you. It's a practice that I've done quite often, you know, when the market is right on the thing.

Q. So your purpose for investing in the securities on margin or with borrowed funds was primarily for the income that you got?

A. The income and the positive spread there, and you know, there was a market out there for those instruments if I wanted to sell them back.

Q. Was there any other purpose for investing those securities, the Israeli bonds?

A. Well, they were backed by the Government so there was no way that I could lose money on those bonds because it's an agency of the Government that was providing those funds to Israeli [sic], I guess, to probably buy war materials with.

Q. Could you have purchased the "Ginny Mae's" (GNMA) and the Israeli bonds without buying them on margin or without having to borrow money to purchase them?

A. At that time I couldn't have bought the quantity that I did.

Q. But you could have bought some?

A. I could have bought some, but I didn't have the liquidity at that time to buy them all.

Q. But you purchased them on margin and with borrowed funds—

A. Right.

Q. —in order to increase your yield or income?

A. That's right.

(Jordan Deposition, pp. 25–27.)

As indicated above, Section 514(b)(1)(A)(i) creates an exception from the definition of debt-financed property, for the purchase of property substantially related to the taxpayer's tax-exempt function. The statute specifically excludes from this exemption, however, property purchased as a result of the "need of the organization for income or funds." According to its president, ACCU purchased the debt-financed securities in order to increase its "yield or income." Accordingly, by statute, the purchase of these debt-financed securities was not substantially related to the plaintiff's tax-exempt function and the income therefrom is taxable under Section 511 of the Code.

The case of *Elliot Knitwear Profit Sharing Plan v. C.I.R.*, 614 F.2d 347 (3d Cir.1980), is on point. The taxpayer in *Elliott Knitwear* was an employee profit-sharing plan and thus exempt from federal income taxation pursuant to Sections 401(a) and 501(a). The plan purchased securities on margin for the purpose of maximizing

the funds that would be available for distribution to employees. The plan realized substantial income on its investments and argued, as does the plaintiff herein, that the margin securities were not debt-financed property under Section 514 and that, therefore, the income therefrom was not taxable under Section 511. The court properly rejected the plan's arguments, and its language is instructive:

> With a profit-sharing plan, on the other hand, while investment of the fund probably is inherent to its tax exempt purpose, debt-financed investment is not.
>
> .     .     .     .     .
>
> It is expected that the buying and selling of income-producing property will be a method utilized to increase and accumulate income and gains, but such investment activity is a means to accomplish the purpose of deferred compensation—it is not the purpose itself of the Plan. Even assuming, arguendo, that investment of contributions for accumulation of income is a function of the Plan, indebtedness or acquisition of securities on margin is not necessary for such accumulation or that purpose.

*Elliot Knitwear*, 614 F.2d at 350.

The same reasoning applies to this case. To the extent that ACCU has surplus funds which are not being loaned to its members, it is reasonable for ACCU to invest these funds in income-producing securities. As stated, ACCU may invest in securities,

without losing its tax-exempt status and without incurring a tax liability, provided that the securities are not purchased with debt financing. Further, Congress has not specifically prohibited tax-exempt organizations such as ACCU from purchasing debt-financed securities. Instead, Congress determined, and the Third Circuit has reiterated, that when a tax-exempt organization does purchase debt-financed securities, it shall pay taxes on the income earned therefrom.[11]

Both the Third Circuit's decision in *Elliot Knitwear* and the Government's position in this case are well founded in the legislative history of the unrelated business income statutes. As stated, Congress originally enacted the unrelated business income tax in order to eliminate the unfair competitive advantage of exempt organizations and to prevent exempt organizations from expanding their operations with tax-free profits, while their taxpaying competitors could expand only with profits remaining after taxes. *C.F. Mueller Co. v. Commissioner*, 479 F.2d 678, 682 n. 7 (1973).[12] Furthermore, one of the purposes for the 1969 amendments to Section 514 was to expand the unrelated business income tax to virtually all tax-exempt organizations, including credit unions. *See* H.R. No. 413, 91st Cong., 1st Sess., *reprinted* in 1969 U.S. Code Cong. & Ad.News 1645, 1692; S.Rep. No. 552, 91st Cong., 1st Sess., *reprinted* in

---

**11.** ACCU argued in its protest letter that it was required to purchase the debt-financed securities because it is subject to regulation by both state and federal banking authorities and its investment options are limited. This argument lacks merit. Pursuant to Alabama Code (1975) § 5-17-4 (Supp.1985), ACCU is empowered to make a variety of investments including the following:

> (a)(6) To deposit in state and national banks, savings and loan associations, the accounts which are insured by the Federal Savings and Loan Insurance Corporation or the Federal Deposit Insurance Corporation, and of other credit unions;
>
> (7) To invest in any investment legal for savings banks or for trust funds in the state; and
>
> .     .     .     .     .

> (b) ... to engage in any activity in which such credit union could engage were such credit union operating as a federally chartered credit union, including but not by way of limitation because of enumeration, the power to do any act and own, possess and carry as assets property of such character including stocks, bonds, or other debentures which, at the time, are authorized under federal laws or regulations for transactions by federal credit unions, ....

Further, regardless of whether the purchase of the subject securities was one of the few or many investment opportunities available to ACCU, it was not required to purchase the securities on margin or with borrowed funds. Having done so, ACCU must now pay taxes on the income therefrom.

**12.** *See also* footnote 8, *supra*.

1969 U.S.Code Cong. & Ad.News 2027, 2096.

William Edward Jordan, president of ACCU, testified in his deposition that during the tax year in question, the plaintiff had approximately 200 corporate credit union members and approximately 10,000 individual members.[13] The individual members included officers, directors and employees of other credit unions and former members of the Teamster Credit Union. Mr. Jordan also testified that any member of the credit union could get a loan from ACCU if that member met certain credit and income requirements.

Mr. Jordan's testimony indicates that ACCU's competitors include all commercial lending institutions. When an individual member needs a loan, he may seek it from ACCU or a variety of commercial lenders, including banks and finance companies. This is precisely why ACCU should be taxed on any income from debt-financed securities. If ACCU is allowed to earn tax-free income on debt-financed securities, it will obtain an unfair advantage over its competitors who must pay taxes on similar investments. This is exactly what Congress sought to prevent when it enacted the unrelated business income tax, and it should not be allowed in this case.

The plaintiff's reliance on Revenue Rule 79–122 is misplaced. That revenue ruling pertains to an employee stock ownership plan ("ESOP"). As indicated in the revenue ruling, the very purpose of an ESOP is to acquire the stock of an employer for distribution to the employees. If an ESOP borrows to purchase stock, it is doing so as a function of and in performance of its tax-exempt purpose. In this case, as indicated by Mr. Jordan's deposition, the plaintiff used debt financing to increase the income or yield from the subject securities. As stipulated, the purposes or functions constituting the basis for ACCU's exemp-

tion under Sections 501(a) and 501(c)(14)(A) are to: (1) promote thrift among its members; and (2) create a source of credit for its members at legitimate rates of interest. Borrowing in order to increase the yield or income from securities investments is not essential to these purposes or functions.

■ A relatively insignificant portion of the tax liability in question arises as a result of $1,015.20 earned by ACCU in 1977 for servicing cancer and group life insurance programs. The Internal Revenue Service determined that this income was unrelated business taxable income within the meaning of Section 512 and therefore taxable. ACCU is seeking to contest the Internal Revenue Service's determination in this proceeding. ACCU failed, however, to present any facts or argument in support of its position on this issue in its claim for refund. Accordingly, it is clear that ACCU may not be heard on this issue in this case. As stated by the former Fifth Circuit:

All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into; the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed. ... (Citations omitted.) Anything not raised at that time cannot be raised later in a suit for refund.

*Alabama By-Products Corp. v. Patterson,* 258 F.2d 892, 900 (5th Cir.1958), *cert. denied,* 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959). *See also Mallette Brothers Construction Co., Inc. v. United States,* 695 F.2d 145, 155 (5th Cir.1983). ("Absent a waiver by the Government, a taxpayer is barred from raising in a refund suit grounds for recovery which had not previously been set forth in its claim for a refund.")[14] Therefore, ACCU is barred

---

**13.** As noted, during the tax year in question, Alabama Central Credit Union had members who were credit unions, its "wholesale" side, and members who were individuals, its "retail" side. After 1980, Alabama Central Credit Union split into two organizations, Alabama Corporate Credit Union which now does the wholesale business, and Alabama Central Credit Union, the plaintiff herein, which now does the retail business.

**14.** Even if the court did have jurisdiction, ACCU would lose on the merits of this issue. Pursuant

from litigating this issue in this proceeding, and this court lacks jurisdiction to hear ACCU's arguments on this portion of the case.

A separate order in conformity with this opinion will be entered.

APPENDIX

Internal Revenue Code of 1954 (26 U.S.C.):

### SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) *Exemption From Taxation.*—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

\*　　\*　　\*　　\*　　\*　　\*

(c) *List of Exempt Organizations.* —The following organizations are referred to in subsection (a):

\*　　\*　　\*　　\*　　\*　　\*

(14)(A) Credit unions without capital stock organized and operated from mutual purposes and without profit.

\*　　\*　　\*　　\*　　\*　　\*

### SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS.

(a) *Charitable, Etc., Organizations Taxable at Corporation Rates.*—

(1) *Imposition of tax.*—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a tax computed as provided in section 11. In making such computation for purposes of this section, the term "taxable income" as used in section 11 shall be read us "unrelated business taxable income."

(2) *Organizations subject to tax.*—

(A) *Organizations described in sections 401(a) and 501(c).*—The taxes imposed by paragraph (1) shall apply in the case of any organization (other than a trust described in subsection (b) or an organization described in section 501(c)(1)) which is exempt, except as provided in this part or part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a).

(B) *State colleges and universities.* —The taxes imposed by paragraph (1) shall apply in the case of any college or university which is an agency or instrumentality of any government or any political subdivision thereof, or which is owned or operated by a government or any political subdivision thereof, or by any agency or instrumentality of one or more governments or political subdivisions. Such tax shall also apply in the case of any corporation wholly owned by one or more such colleges or universities.

\*　　\*　　\*　　\*　　\*　　\*

### SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) *Definition.*—For purposes of this title—

to this court's order of May 24, 1985, each of the defendant's requests for admissions filed May 8, 1984, are deemed admitted. Accordingly, ACCU has admitted that: (i) during 1977, it earned commissions for servicing cancer and group life insurance policies; (ii) these policies are for the express benefit of the insured without any reference to the member's loans or accounts with the credit union; (iii) ACCU derived no benefit from the policies other than commissions on sale of said policies earned from the insurance companies which issued the policies; (iv) the sale of the cancer and group life insurance policies referred to has no substantial, causal relationship to ACCU's exempt purposes; and (v) the sale of the policies bears no relationship to ACCU's function as a credit union. Based upon these admissions, it is clear that by servicing these insurance policies, ACCU was engaging in a "trade or business which is not substantially related" to its exempt purpose. See Section 513(a)(1). Accordingly, the income therefrom is taxable pursuant to Section 511. *See also* Treas.Reg. § 1.513–1(d)(2) and *Louisiana Credit Union League v. United States,* 693 F.2d 525 (5th Cir.1982).

(1) *General rule.*—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

\* \* \* \* \* \*

(b) *Modifications.*—The modifications referred to in subsection (a) are the following:

(1) There shall be excluded all dividends, interest, payments with respect to securities loans (as defined in Section 512(a)(5)), and annuities, and all deductions directly connected with such income.

(2) There shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income.

(3) In the case of rents—

(A) Except as provided in subparagraph (B), there shall be excluded—

(i) all rents from real property (including property described in section 1245(a)(3)(C)), and

(ii) all rents from personal property (including for purposes of this paragraph as personal property any property described in section 1245(a)(3)(B)) leased with such real property, if the rents attributable to such personal property are an incidental amount of the total rents received or accrued under the lease, determined at the time the personal property is placed in service.

(B) Subparagraph (A) shall not apply—

(i) if more than 50 percent of the total rent received or accrued under the lease is attributable to personal property described in subparagraph (A)(ii), or

(ii) if the determination of the amount of such rent depends in whole or in part on the income or profits derived by any person from the property leased (other than an amount based on a fixed percentage or percentages of receipts or sales).

(C) There shall be excluded all deductions directly connected with rents excluded under subparagraph (A).

(4) Notwithstanding paragraph (1), (2), (3), or (5), in the case of debt-financed property (as defined in section 514) there shall be included, as an item of gross income derived from an unrelated trade or business, the amount ascertained under section 514(a)(1), and there shall be allowed, as a deduction, the amount ascertained under section 514(a)(2).

(5) There shall be excluded all gains or losses from the sale, exchange, or other disposition of property other than—

(A) stock in trade or other property of a kind which would properly be includible in inventory if on hand at the close of the taxable year, or

(B) property held primarily for sale to customers in the ordinary course of the trade of business.

\* \* \* \* \* \*

### SEC. 514. UNRELATED DEBT-FINANCED INCOME.

(a) *Unrelated Debt-Financed Income and Deductions.*—In computing under section 512 the unrelated business taxable income for any taxable year—

(1) *Percentage of income taken into account.*—There shall be included with respect to each debt-financed property as an item of gross income derived from an unrelated trade or business an amount which is the same percentage (but not in excess of 100 percent) of the total gross income derived during the taxable year from or on account of such property as (A) the

average acquisition indebtedness (as defined in subsection (c)(7)) for the taxable year with respect to the property is of (B) the average amount (determined under regulations prescribed by the Secretary) of the adjusted basis of such property during the period it is held by the organization during such taxable year.

(2) *Percentage of deductions taken into account.*—There shall be allowed as a deduction with respect to each debt-financed property an amount determined by applying (except as provided in the last sentence of this paragraph) the percentage derived under paragraph (1) to the sum determined under paragraph (3). The percentage derived under this paragraph shall not be applied with respect to the deduction of any capital loss resulting from the carryback or carryover of net capital losses under section 1212.

(3) *Deductions allowable.*—The sum referred to in paragraph (2) is the sum of the deductions under this chapter which are directly connected with the debt-financed property or the income therefrom, except that if the debt-financed property is of a character which is subject to the allowance for depreciation provided in section 167, the allowance shall be computed only by use of the straight-line method.

(b) *Definition of Debt-Financed Property.*—

(1) *In general.*—For purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an acquisition indebtedness (as defined in subsection (c)) at any time during the taxable year (or, if the property was disposed of during the taxable year, with respect to which there was an acquisition indebtedness at any time during the 12-month period ending with the date of such disposition), except that such term does not include—

(A)(i) any property substantially all the use of which is substantially relat-

ed (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function designated in section 501(c)(3)), or (ii) any property to which clause (i) does not apply, to the extent that its use is so substantially related;

  *    *    *    *    *    *

(c) *Acquisition Indebtedness.*—

(1) *General rule.*—For purposes of this section, the term "acquisition indebtedness" means, with respect to any debt-financed property, the unpaid amount of—

(A) the indebtedness incurred by the organization in acquiring or improving such property;

(B) the indebtedness incurred before the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement; and

(C) the indebtedness incurred after the acquisition or improvement of such property if such indebtedness would not have been incurred but for such acquisition or improvement and the incurrence of such indebtedness was reasonably foreseeable at the time of such acquisition or improvement.

  *    *    *    *    *    *

(4) *Indebtedness incurred in performing exempt purposes.*—For purposes of this section, the term "acquisition indebtedness" does not include indebtedness the incurrence of which is inherent in the performance or exercise of the purpose or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in

section 501(c)(14) in accepting deposits from its members.

\* \* \* \* \* \*

### FINAL JUDGMENT ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that:

(1) Income derived by plaintiff from the debt-financed portion of securities is taxable as unrelated business income under Section 511 of the Internal Revenue Code; and

(2) This court lacks jurisdiction in this case to determine whether earned income in the form of commissions received by plaintiff for servicing cancer and group life insurance programs constitutes unrelated business income under Section 511 of the Internal Revenue Code.

Accordingly, FINAL JUDGMENT is hereby entered in favor of the defendant, United States of America, and against the plaintiff, Alabama Central Credit Union, and plaintiff shall have and recover nothing of the defendant.