**OCEAN COVE CORPORATION RETIREMENT PLAN AND TRUST, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. 85–8112–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Feb. 19, 1987.

Stuart Gollinger, Westport, Conn., for plaintiff.

Michael J. King, and Jose F. DeLeon, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND FINAL JUDGMENT

SPELLMAN, District Judge.

The Plaintiff is a qualified pension trust fund established by a written agreement of trust between Ocean Cove Corporation, a Florida Corporation, employer, and a named trustee. Over a four year period, from 1978 through 1981, the Plaintiff realized short term capital gains from investments in securities purchased on borrowed funds through a margin account. The Internal Revenue Service ("Service") assessed a deficiency on these tax obligations. The Plaintiff paid this deficiency, claimed a refund from the Service, which the Service denied, and then filed this action for the recovery of these disputed funds.

This case presents an interesting tax issue, one that only two other federal courts have examined. The basic question presented is: whether securities purchased on margin by an otherwise tax-exempt pension plan constitutes debt-financed property, such that any profits that are traceable to these margined securities are subject to a tax imposed on unrelated business income? Because this Court finds that investments in debt-financed property does not have a substantial relationship to the tax-exempt function of a qualified nonprofit pension retirement plan, it is hereby

ORDERED AND ADJUDGED that the Plaintiff taxpayer does not have a cognizable claim for tax refund under existing law, and judgment is entered in favor of the Defendant, the United States Government. It is furthermore

ORDERED AND ADJUDGED that judgment is entered in favor of the Plaintiff on the Defendant's counterclaim for interest on accrued interest from the time in which the taxes and original interest were paid, and the Plaintiff will have no further tax liabilities for the years in question.

The taxpayer opened a margin account at a securities brokerage firm. Because the taxpayer is a qualified pension fund, it is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), which requires that the employer make actuarially determined contributions to the plan in providing for the livelihood of the employees upon retirement. The profits that accrue to this fund are tax-exempt, like so many other organizations that are filled with an overwhelming public purpose sufficient to justify an exemption from Federal income tax responsibilities.

■ Congress exempts certain nonprofit organizations from income tax obligations so as to allow these groups to carry out their exempt purposes. 26 U.S.C. § 501(a) (1976). Soon after the creation of these tax-exempt categories, Congress realized that an organization could take advantage of its nonprofit exempt status and compete unfairly against taxpaying businesses. In response to this structural inequity, Congress, in 1950, enacted the unrelated business income tax.[1] This tax was intended to reach a nonprofit organization's attempt at expanding with the use of tax-exempt funds, when the source of these funds were unrelated to the purpose behind the granting of its exempt status. *See* H.R. Rep. No. 2319, 81st Cong., 2d Sess., 36 (1950); S.Rep. No. 2375, 81st Cong., 2d Sess., 28 (1950), U.S.Code Cong.Serv. 1950, p. 3053.

■ Another case that arises in this context involves a taxpayer's use of acquisi-

---

1. Section 512 of the Internal Revenue Code, entitled Unrelated business taxable income provides in relevant part that the term means the "gross income derived from any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, ..." 26 U.S.C. § 512(a)(1) (1986). Section 513, which defines Unrelated Trade or Business, states that the term "means, in the case of an organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds ...) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under 501.... 26 U.S.C. § 513(a) (1986).

tion indebtedness to expand its otherwise nontaxable operation. When a tax-exempt organization relies on debt-financed property to further its investment objectives, the general rule treats this transaction as a taxable event even though the profits from such an activity would not normally be subject to a tax absent the use of borrowed funds. Section 514 of the Internal Revenue Code treats debt-financed property as taxable unrelated business income if the use of the property is not "substantially related (aside from the need of the organization for income or funds) to the exercise or performance" of the organization's tax-exempt function.[2]

The Plaintiff pension fund argues that the use of margined securities is not unrelated business income because the mere management of investments is not the carrying on of a separate business activity. *United States v. Pyne,* 313 U.S. 127, 61 S.Ct. 893, 85 L.Ed. 1231 (1941); *City Bank Farmers Trust Co. v. Helvering,* 313 U.S. 121, 61 S.Ct. 896, 85 L.Ed. 1227 (1941); *Higgins v. Commissioner,* 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941).

■ This Court finds that neither this opinion, nor the other cases that have found margined securities trading to constitute debt-financed property and subject to a tax, would ever conclude that the use of this type of investment strategy calls for the elimination of the Plaintiff's otherwise tax-exempt status. When Congress closed the loophole that allowed nonprofit organizations to expand their operations with the use of tax-exempt income, the resulting tax on unrelated business income, which includes investments in debt-financed property, never contemplated the elimination of an organization's tax-exempt privilege. Indeed, the taxability of debt-financed income has no effect on the nonprofit organization's tax-exempt status. The taxpayer in

this case can continue to avail itself of the tax-exempt privileges that qualified pension funds receive, but the income or profits attributable to the management of debt-financed property is subject to federal income tax liabilities in the same way as would any other tax obligation derived from an unrelated business activity. *See, e.g., Elliot Knitwear Profit Sharing, Etc. v. C.I.R.,* 614 F.2d 347, 349 (3d Cir.1980) (stating that "the tax-exempt status of an organization is not nullified by a tax on debt-financed income."); *Alabama Cent. Credit Union v. United States,* 646 F.Supp. 1199, 1206 (N.D.Ala.1986) (reflecting the Third Circuit's view that "when a tax-exempt organization does purchase debt-financed securities, it shall pay taxes on the income earned therefrom.").

The second argument that the Plaintiff taxpayer offers in support of its position that the profits earned from its investment in margined securities is exempt from income tax liability is based on its view that this investment strategy is substantially related to the reason behind the granting of its exempt status. Plaintiff realizes that the exception to the tax normally placed on debt-financed property, which excludes property that is substantially related to the organization's exempt purpose, does not apply to assist the taxpayer if reliance on its tax-exempt function is based on the organization's need for income or funds. 26 U.S.C. § 514(b)(1)(A) (1976).

It is the Plaintiff's view, however, that the purchase and sale of securities on margin is not in any way inconsistent with the exercise and performance of its exempt purpose or function. According to the Plaintiff taxpayer, the treasury regulations governing the operation of qualified pension trust funds contemplates that an employer must contribute definite and deter-

---

**2.** § 514 Unrelated debt-financed income
. . . .
(b) Definition of debt-financed property.—
(1) In general.—For the purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an acquisition indebtedness ... at any time during the taxable year ..., except that such term does not include—

(A)(i) any property substantially all the use of which is *substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization* of its charitable, educational *or other purpose or function constituting the basis for its exemption* .... 26 U.S.C. § 514(b)(1)(A)(i) (1986) (emphasis added).

minable retirement benefits, and that the amount of these contributions are made without regard to the profits or performance of the business or the fund itself. Treas.Reg. § 1.401–1(b)(1)(i). The employer therefore concludes that it is statutorily obligated to fund this pension plan, and that these benefits are actuarially determined and not dependent on profits. Consequently, the use of these margined securities merely resulted in what is known as "experience gains," meaning that this investment strategy simply outperformed the taxpayer's original expectations for the funding of this pension plan and thereby accelerated the speed within which the employer satisfied its pension liabilities.

The employer mistakenly placed undue reliance on the minimum funding requirements that ERISA imposes. 26 U.S.C. § 412(b)(1) (1976). Although it is true that the Internal Revenue Code calls for the imposition of an excise tax on an employer who maintains a pension trust fund that has experienced an "accumulated funding deficiency," 26 U.S.C. § 4971 (1976), neither the speed with which the plan is funded, nor the fact that the retirement benefits are fixed in advance, constitute the purpose behind the exempt status of the fund. Congress exempts pension trust funds from federal income tax liabilities because the purpose or function that underlies this exemption is to provide for the livelihood of employed persons upon their retirement. This is the real purpose for the exemption, not the fact that the employer, if it so chooses to create a pension plan, is required by law to make actuarially determined contributions to the plan and is subject to penalties for the failure to properly supervise its administration.

Federal courts have addressed this same question on just two other occasions. In *Elliot Knitwear Profit Sharing, Etc. v. C.I.R.*, 614 F.2d 347 (3d Cir.1980), the Court of Appeals for the Third Circuit focused on the question of the taxability of debt-financed property used in conjunction with the funding of an employer profit sharing plan. The taxpayer argued that employer contributions to the fund is consistent with its exempt function. The court noted that "such a purpose may be accomplished with-

out borrowing and is not essential to the existence of such a plan." *Elliot Knitwear Profit Sharing*, 614 F.2d at 349. Similarly, in *Alabama Cent. Credit Union v. United States*, 646 F.Supp. 1199 (N.D. Ala.1986), the Plaintiff, a tax-exempt credit union, contended that the purchase and sale of securities on margin is "inherent" in the performance of its tax-exempt function. The court ruled that the use of borrowed funds "in order to maximize the yield or income therefrom does not constitute a purchase of property substantially related to the debtor's tax-exempt function." *Alabama Cent. Credit Union*, 646 F.Supp. at 1204 (reviewing and quoting section 514(b)(1)(A)(i) of the Internal Revenue Code).

The Plaintiff taxpayer has made every effort to distinguish these cases from the circumstances presented here. Although this Court is in agreement that the facts of this case, which involves a qualified pension plan, comes much closer to establishing the "substantial relationship" test than did these other cases, the fact remains that the main purpose of a pension retirement plan is to provide for the future retirement of existing employees. Plaintiff argues that the profit sharing plan in *Elliot Knitwear* is legally and factually distinguishable from this case because a profit sharing plan has no funding requirements. Moreover, Plaintiff argues that a profit sharing plan has no other purpose other than to increase the yield or income from the investments. Essentially, Plaintiff seems to be arguing that there is a significant difference between funding a plan in order to reduce actuarially determined pension liabilities, and the contributions made to a profit sharing arrangement that seeks only to increase profits without regard to a statutorily mandated contribution schedule. This Court disagrees.

The stockbroker for the Plaintiff pension plan answered affirmatively in his deposition testimony that the purpose of purchasing the securities on margin was to increase the yield or income from the use of debt-financed property. As already pointed out, section 514(b)(1)(A)(i) of the Internal Revenue Code, with regard to acquisition

indebtedness, does not allow an exemption from otherwise taxable unrelated business income if it is discovered that the purpose for the use of borrowed funds is the "need of the organization for income or funds." 26 U.S.C. § 514(b)(1)(A)(i) (1976). Moreover, even without this testimony, a pension plan simply cannot show that the use of debt-financed property is "substantially related" to the tax-exempt purpose behind the granting of this immunity from the tax placed upon unrelated business income.

In *Alabama Central Credit Union,* the president of the Plaintiff credit union answered affirmatively that the purpose for the use of borrowed funds was to increase the yield or income of the entire fund. The district court concluded that this response alone indicated that the purpose behind this investment strategy could not have been substantially related to its tax-exempt purpose. *Alabama Cent. Credit Union,* 646 F.Supp. at 1205. Moreover, the court cited *Elliot Knitwear* for the proposition that although investment activity in income producing property may accomplish the purpose of creating deferred compensation, this is not the actual purpose of the plan, but only a means by which to ultimately accomplish its underlying purpose. *Id.* at 1206 (quoting *Elliot Knitwear,* 614 F.2d at 350). With a credit union, the underlying purpose is to promote thrift and to create a source of credit at reasonable interest rates. A pension plan is designed to provide for the retirement of current employees. Investing in securities, particularly those that are purchased on margin, is merely one way of accomplishing the intended purposes behind the creation of these tax-exempt categories. A particular investment strategy that contemplates the use of otherwise taxable debt-financed property cannot under most circumstances be shown to further the purpose behind a nonprofit organization's existence, or prove to have a substantial relationship to its actual tax-exempt function.

Finally, while it is true that the Plaintiff, by availing itself of this exemption, has not received an unfair competitive advantage as against other tax paying businesses, this is not the only abuse or inequity that Congress sought to rectify when it imposed a tax on unrelated business income. The fact remains that the nonprofit tax-exempt status of this Plaintiff taxpayer permitted it to expand the size of its pension fund from within. Without making its own contributions, the employer relied on the confluence between the use of margined securities and the presence of a rising stock market to increase the net yield, free from tax liabilities. The employer undeniably used tax-free profits to reduce the amount of contributions that it otherwise was required to make, and essentially took advantage of funds that should have been exposed to a tax on unrelated business income. While its tax-exempt status remains intact, the short term capital gains traceable to the use of debt-financed property cannot be countenanced under existing law.

■ On a separate matter, this Court will not allow the Service to assess against this taxpayer interest on top of interest already paid. In light of the fact that the Service spent over two years before informing the Plaintiff of the exact amount of interest obligations owing for the aforementioned years, this Court will not allow the Service to profit by this unnecessary delay in satisfying the statutory requirements of a timely and reasonable notice of interest assessments.

Final Judgment is therefore entered in favor of the Defendant and against the Plaintiff on the underlying claim, but in favor of the Plaintiff and against the Defendant on the Defendant's counterclaim seeking interest that had accrued on the initial interest on principal tax liabilities from the dates that the underlying tax obligations were paid to the date the initial interest was paid.