SOUTHWEST TEXAS ELECTRIC COOPERATIVE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Southwest Tex. Elec. Coop. v. Commissioner
Docket No. 9635-93
United States Tax Court
T.C. Memo 1994-363; 1994 Tax Ct. Memo LEXIS 370; 68 T.C.M. (CCH) 285; August 1, 1994, Filed *370 Decision will be entered for respondent. P, a nonprofit rural electric cooperative, is generally exempt from Federal income tax under sec. 501(a), I.R.C. P borrowed funds to replace funds that it had spent in its exempt activities. Immediately after receiving the borrowed funds, P invested them in two United States Treasury Notes that paid interest during the years in issue. Held: The interest is unrelated debt-financed income under sec. 514, I.R.C., that is subject to Federal income tax under sec. 511, I.R.C.
For petitioner: William Norton Baker. *
For respondent: Mary K. McIlyar. LARO
LARO
MEMORANDUM OPINION LARO, Judge: The case is before the Court fully stipulated under Rule 122(a). [1] Southwest Texas Electric Cooperative, Inc. (petitioner), petitioned the Court for redetermination of respondent's determination of deficiencies of $ 9,868.58 and $ 20,622.03 in its 1989 and 1990 Federal income tax, respectively. *371 We must decide whether interest earned on two United States Treasury Notes (T-Notes) purchased by petitioner with certain borrowings constitutes unrelated debt-financed income under section 514. [2] If we decide this issue in the affirmative, the interest will be subject to Federal income tax under section 511. We decide in the affirmative; the interest is taxable debt-financed unrelated income. *372 Background
All of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. When the petition was filed, petitioner was a corporation doing business in Texas. Petitioner is a nonprofit rural electric distribution cooperative organized under Texas law. See Tex. Rev. Civ. Stat. Ann. art. 1528b (West 1980). Petitioner is described in section 501(c)(12), and it is generally exempt from Federal income tax under section 501(a). Petitioner's exempt purpose includes providing retail electric service to its members on a cooperative basis. The Rural Electrification Administration, U.S. Department of Agriculture (REA), was established in 1935 as a lending agency responsible for developing a program for rural electrification. The REA makes loans and loan guarantees to finance the construction of electric distribution, transmission, and generation facilities that are required to provide adequate electric service in rural areas. The application process for an REA loan is expensive, complicated, and relatively long. Loan proceeds that are approved by the REA may be drawn as the construction progresses *373 or as the applicant otherwise chooses. As a condition to drawing the funds, however, the applicant must first submit certified evidence of completed construction of projects described in a construction budget. Petitioner applied for an REA loan in 1983 to expand and upgrade its facilities in order to provide adequate electric service to its member consumers. Following the REA's approval of petitioner's loan application, petitioner and the REA executed an agreement on August 24, 1983, under which the REA promised to loan petitioner $ 5,148,000 at 5-percent interest per annum. The loan agreement provided that the funds had to be requisitioned within 6 years or they would be forfeited. After borrowing one-half of the funds, petitioner's working capital was such that it determined that it did not need the remaining funds of $ 2,574,000. After receiving notification that the remaining funds would not be available after August 1, 1989, however, petitioner's board of directors (Board) authorized the requisition of the remaining $ 2,574,000. In so doing, the Board was prompted, in part, by the possibility that petitioner would be unable to receive another low interest loan from the *374 REA. The Board was also prompted, in part, by the facts that petitioner would have wasted time and money if petitioner did not requisition the remaining funds, that it was much easier to take the funds at that time instead of starting the long and expensive loan process anew at a later date if funds were then needed, and that the Government might choose to discontinue the REA program. On May 16, 1989, the REA loaned petitioner the remaining funds. On May 18, 1989, petitioner spent $ 2,575,735.25 to purchase two T-Notes. [3] One of the notes was a 5-year T-Note with a $ 1 million face value, an interest rate of 9.5 percent, and a maturity date of May 15, 1994; $ 1,044,150.67 was used to purchase it due to accrued interest of $ 19,931.92 and a broker fee of $ 24,218.75. The other note was a 10-year T-Note with a $ 1.5 million face value, an interest rate of 9.125 percent, and a maturity date of May 15, 1999; $ 1,531,584.58 was used to purchase it due to accrued interest of $ 1,115.83 and a broker fee of $ 30,468.75. *375 Petitioner received interest of $ 146,096.61 from the T-Notes in 1989, and it had related expenses during that year of $ 86,222.29. Petitioner received interest of $ 230,938.49 from the T-Notes in 1990, and it had related expenses during that year of $ 134,812.53. For its 1989 and 1990 taxable years, petitioner filed Forms 990, Return of Organization Exempt From Income Tax, and did not report any unrelated business income. Respondent determined that petitioner should have included in its 1989 and 1990 taxable income the net interest (interest received less related expenses) of $ 59,874.32 and $ 95,731.84, respectively, earned on the T-Notes. [4] Respondent determined that the net interest was subject to Federal income tax under section 511. *376 Discussion
Section 511(a)(1) imposes a tax at corporate rates, on the unrelated business taxable income of organizations described in section 501(c). [5] See also sec. 511(a)(2). The term "unrelated business taxable income" generally means the corporation's gross income from an unrelated trade or business carried on by it, less deductions that are directly connected with the carrying on of the trade or business. Sec. 512(a)(1). The computation of a corporation's unrelated business taxable income generally does not take into account interest or the deductions connected thereto. [6] Sec. 512(b)(1). However, interest is included as an item of gross income derived from an unrelated trade or business when the interest is earned on debt-financed property. Secs. 512(b)(4), 514(b)(1); see also sec. 514(a). *377 The term "debt-financed property" is broadly defined to bring within its reach most income-producing property that is acquired or improved by an exempt organization with the use of borrowed funds. Specifically, property generally constitutes debt-financed property if: (1) The property is held to produce income, such as rental real estate, tangible personal property, corporate stock, or certificates of deposit, and (2) there is acquisition indebtedness with respect to the property at any time during the taxable year. Kern County Elec. Pension Fund v. Commissioner, 96 T.C. 845, 851 (1991), affd. without published opinion 988 F.2d 120 (9th Cir. 1993); sec. 514(b)(1); sec. 1.514(b)-1(a), Income Tax Regs. The term "acquisition indebtedness" includes the unpaid portion of the indebtedness incurred by the organization in acquiring or improving debt-financed property. Sec. 514(c)(1)(A). Petitioner primarily argues that the T-Notes are not debt-financed property because the indebtedness from the REA was not incurred for investment; rather, petitioner contends, the indebtedness was incurred to construct property to be used in furtherance *378 of its exempt purpose. As support for its argument, petitioner relies primarily on section 514(b)(1) which provides that: the term "debt-financed property" * * * does not include -- (A)(i) any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization of its * * * purpose or function constituting the basis for its exemption under section 501 * * *
We find petitioner's reliance on section 514(b)(1)(A)(i) misplaced. The Congress broadly defined the term "debt-financed property" to include prima facie any income-producing property that an exempt entity purchased with borrowed funds. Sec. 514(b)(1) and (c)(1)(A). The T-Notes fall within this definition because petitioner purchased them with the loan proceeds that it received from the REA. Contrary to petitioner's assertions, section 514(b)(1)(A)(i) does not dictate a contrary result. Assuming arguendo that petitioner did not borrow the remaining funds of $ 2,574,000 primarily for investment, [7] *380 we do not agree with it that section 514(b)(1)(A)(i) automatically excludes the T-Notes from the definition *379 of "debt-financed property". Petitioner's mere application of the interest earned on the T-Notes to its exempt activities does not serve to make the income-producing property "substantially related" to its exempt purpose under section 514(b)(1)(A)(i). Rather, the linchpin of that section is that the T-Notes themselves must be used by petitioner in the exercise or performance of its exempt activities. Elliot Knitwear Profit Sharing Plan v. Commissioner, 71 T.C. 765, 769-770 (1979), affd. 614 F.2d 347 (3d Cir. 1980); see also Ocean Cove Corp. Retirement Plan and Trust v. United States, 657 F. Supp. 776 (S.D. Fla. 1987). The Court is unable to conclude that the T-Notes are "substantially related" to petitioner's exempt function of providing retail electric services to its members. Sec. 514(b)(1)(A)(i). Accordingly, we hold that the T-Notes are "debt-financed property", and are not "property substantially all the use of which is substantially related * * * to the exercise or performance" of petitioner's exempt purpose. [8]Sec. 514(b)(1)(A)(i).
Petitioner also argues that it did not have "acquisition indebtedness" with respect to the T-Notes because its incurring the debt of $ 2,574,000 was inherent in the performance of its exempt purpose. Petitioner further argues that the term "acquisition indebtedness" would only encompass a loan from the REA if the taxpayer had taken the loan for the purpose of investment. Petitioner relies on section 514(c)(4) which provides that: the term "acquisition indebtedness" does not include indebtedness the incurrence of which is inherent in the performance or exercise of the purpose *381 or function constituting the basis of the organization's exemption, such as the indebtedness incurred by a credit union described in section 501(c)(14) in accepting deposits from its members.
We disagree with petitioner's arguments. Simply put, the debt that petitioner owed to the REA is "acquisition indebtedness" because the debt was used by petitioner to acquire the T-Notes. Indeed, but for these borrowings, petitioner would not have purchased the T-Notes. We also disagree with petitioner's assertion that the term "acquisition indebtedness" would only encompass a loan from the REA if the taxpayer had taken the loan for the purpose of investment. Section 514 applies to an exempt organization that uses borrowed funds to purchase an income-producing asset that is unrelated to the organization's exempt purpose. We also disagree with petitioner as to the applicability of section 514(c)(4); that section focuses on whether the indebtedness is essential to the exempt function. Elliot Knitwear Profit Sharing Plan v. Commissioner, supra at 768; Alabama Cent. Credit Union v. United States, 646 F. Supp. 1199, 1204 (N.D. Ala. 1986). *382 In this regard, petitioner's borrowing of the $ 2,574,000 from the REA on May 16, 1989, was not essential, in the requisite sense, to its exempt purpose of providing electric service to its members on a cooperative basis. As a point of fact, petitioner during the years in issue did not liquidate either T-Note and did not otherwise spend any of the funds that it had borrowed from the REA and that it had invested in the T-Notes. Accordingly, for the foregoing reasons, we sustain respondent's determination that the interest earned on the T-Notes is "unrelated debt-financed income" that is subject to Federal income tax under section 511. In so doing, however, we note that our holding does not eliminate petitioner's exempt status. Elliot Knitwear Profit Sharing Plan v. Commissioner, 614 F.2d 347, 349 (3d Cir. 1980), affg. 71 T.C. 765 (1979). We have considered all arguments made by petitioner and, to the extent not addressed above, find them to be without merit. For the foregoing reasons, Decision will be entered for respondent. Footnotes
*. Brief amicus curiae was filed by Jonathan Hemenway Glazier as counsel for the National Rural Electric Cooperative Association.↩
1. Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.↩
2. Respondent also determined that petitioner: (1) Had net unrelated business income from another source of $ 600 and $ 480 in its 1989 and 1990 taxable years, respectively, and (2) was allowed a $ 1,000 specific deduction under sec. 512 in each of these years. Petitioner did not assign error in its petition to respondent's determination of this unrelated business income. Accordingly, petitioner has conceded the correctness of this determination. Rule 34(b)(4); Frederick v. Commissioner, 101 T.C. 35, 36 n.4 (1993); Jarvis v. Commissioner, 78 T.C. 646, 658↩ (1982). The specific deduction of $ 1,000 naturally flows from respondent's determination that petitioner had unrelated business income in the years in issue. See sec. 512(b)(12).
3. Petitioner's general manager reported at the Board's regular session on June 6, 1989, that he had invested the $ 2,574,000 borrowed from the REA in the T-Notes.↩
4. More specifically, respondent determined that 100 percent of the 1989 net interest was includable in petitioner's 1989 taxable income and 99.59 percent of the 1990 net interest was includable in petitioner's 1990 taxable income. See sec. 514(a); see also infra↩ note 5. Petitioner has not disputed the accuracy of respondent's determination of these percentages, and we do not consider them.
5. The actual amount of this tax, in the case of debt-financed income, is computed by using a debt/equity formula that is not relevant to the question presented herein. See generally sec. 514(a)↩.
6. The Congress generally excluded from tax interest and other investment income earned by exempt organizations because the Congress determined that investors receiving exempt income from passive sources would not be in competition with commercial businesses. Portland Golf Club v. Commissioner, 497 U.S. 154, 162↩ (1990).
7. The record does not support petitioner's contention that the $ 2,574,000 was borrowed from the REA solely for use in petitioner's exempt activities. Rather, the record indicates that petitioner profited form the borrowings, i.e., the interest rate that petitioner paid on the borrowings was 5 percent and the interest rates that petitioner received on the T-Notes were 9.5 and 9.125 percent, respectively. The record also indicates that petitioner borrowed the funds because it: (1) Was uncertain that it could receive another REA loan at favorable interest rates, (2) wanted to receive the full benefit of the available funds for which it had already applied, having spent much time and money in the process, and (3) did not want to undergo the tedious and expensive process of applying for a new REA loan, if outside financing was required in the future.↩
8. Although the T-Notes may be "related" to petitioner's exempt function with respect to its need for income or funds, this possibility does not affect our holding; such a need is outside the realm of the "substantially related" exception. Sec. 514(b)(1)(A)(i); see also Ocean Cove Corp. Retirement Plan and Trust v. United States, 657 F. Supp. 776, 779-780 (S.D. Fla. 1987); Alabama Cent. Credit Union v. United States, 646 F. Supp. 1199, 1205 (N.D. Ala. 1986↩).