KERN COUNTY ELECTRICAL PENSION FUND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4843-89.        Filed June 20, 1991.

*Wayne Jett,* for the petitioner.
*Roger L. Kave,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency in the income tax of Kern County Electrical Pension Fund (petitioner or the pension fund) in the amount of $12,371 for its 1980 taxable year. Petitioner had its principal office in Bakersfield, California, on the date it filed the petition in this case. The case was submitted pursuant to a stipulation of facts and exhibits under our Rule 122.[1] The issue for decision is whether petitioner is liable for the tax on unrelated business taxable income imposed by section 511, often referred to informally as UBIT.

Petitioner is an employee benefit pension plan described in section 401(a) and exempt from Federal income tax pursuant to the provisions of section 501(a). In 1978, the pension fund owned three certificates of deposit issued by Valley Federal Savings & Loan Association (Valley Federal). The certificates had the following terms:

| Date of issuance | Principal sum | Interest rate | Maturity date |
|---|---|---|---|
| Feb. 3, 1978 | $250,000 | 8.125% | Feb. 3, 1983 |
| Apr. 5, 1978 | 300,000 | 8.325 | Apr. 5, 1983 |
| July 12, 1978 | 200,000 | 9.000 | July 12, 1983 |
| | 750,000 | | |

The certificates were of a hybrid type, somewhere between a bond and a savings account. Each certificate had an "Account No.," and recited that the holder "has *opened* a certificate of deposit." (Emphasis supplied.) Like a bond, each certificate of deposit had a stated principal amount, rate of interest, and date of maturity. But like a savings account, and unlike a bond, withdrawals from and additions to principal were recognized, and reductions in interest rate were provided for in certain situations. Thus, the first certificate of deposit provided in part:

Date of Issuance February 3, 1978

THIS CERTIFIES THAT

KERN COUNTY ELECTRICAL WORKERS
PENSION FUND

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code as amended and in effect for the taxable year at issue.

has opened a certificate of deposit in the initial principal sum of $250,000.00 and for the initial term ending February 3, 1983, as adjusted as to principal and term from time to time and recorded in this evidence of account in SAN FERNANDO VALLEY FEDERAL SAVINGS AND LOAN ASSOCIATION, * * *

This sum shall bear interest at the rate of 8.125 % per annum, payable on March 31, 1978 and quarterly thereafter, provided the account is not reduced below the minimum amount established by the association to be eligible to receive the stated rate. * * *

In the event of any withdrawal from this account during the first three months (90 days) of the term, no earnings shall be paid on the amount withdrawn. In the event of any withdrawal thereafter, prior to the conclusion of the term, earnings on the amount withdrawn shall be paid at the then current rate on regular accounts for the period since issuance or renewal of the account, less three months. To the extent necessary to comply with these requirements, deductions shall be made from the amount withdrawn.

The provisions of the other two certificates of deposit were identical except for dates of issuance, principal amounts, maturities (5 years from dates of issuance), and rates of interest. All three will be referred to hereinafter as the "old certificates."

During 1979 and 1980, interest rates payable on certificates of deposit like the old certificates began to increase sharply. In view of such increase, petitioner's board of trustees sent a representative to negotiate with Valley Federal for a higher rate of interest on the old certificates. As stipulated by the parties, "Valley Federal called attention to both the provisions of the Old Certificates and governmental regulations requiring a reduction of accrued interest if the Old Certificates were negotiated for the purpose of purchasing new certificates of deposit."[2] Valley Federal then proposed a plan to pay petitioner "an increased rate of return on the funds invested in the Old

---

[2]Neither the stipulation nor the briefs of the parties identify the Government regulations referred to. Moreover, although the old certificates themselves do provide for a reduction of interest in the event of early withdrawal of principal, nothing therein refers to any negotiation for the purpose of purchasing new certificates of deposit.

Certificates without selling the Old Certificates and thereby triggering the reduced interest rates."

The plan contemplated (1) petitioner's borrowing funds from Valley Federal in three separate loans with each of the three old certificates delivered to Valley Federal as collateral for the respective loan thereon (savings account loan), and (2) the issuance of a new certificate in an amount equal to the aggregate of the three amounts borrowed on the security of the three old certificates. On September 17, 1979, when the plan was put into effect as hereinafter set forth, the account balances in the three old certificates were as follows:

$280,367.37
332,795.23
218,231.50

The amounts to be borrowed pursuant to the plan (taking into account the interest payable by Valley Federal in respect of the balances in the accounts of the old certificates), the rates of interest payable by petitioner on the borrowed funds, and the rate of interest payable to petitioner on the new certificate were so computed that upon consummation of the transaction "the effective rate of return to petitioner on the Old Certificates would be increased to approximately 9.75% per annum."

The stipulation of the parties sets forth petitioner's acceptance of the plan, its implementation, and the computation of the amount of additional interest realized by petitioner, as follows:

8. Petitioner agreed to the terms proposed by Valley Federal and the transaction was implemented as follows:

(a) possession of the Old Certificate passbooks was transferred by Petitioner to Valley Federal;

(b) Valley Federal and Petitioner signed standard form Savings Account Loan Agreements dated September 17, 1979, to document the terms by which the Old Certificates were assigned and pledged as collateral to Valley Federal, and the Petitioner agreed to repay $740,000.00 plus interest at rates from 10.125% to 11.0% per annum. The terms of the loan agreements were as follows:

| Loan amount | Interest rate | Maturity date |
|---|---|---|
| $250,000 | 10.125% | Sept. 17, 1980 |
| 295,000 | 10.375 | Sept. 17, 1980 |
| 195,000 | 11.00 | Sept. 17, 1980 |
| 740,000 | | |

\* \* \* \* \* \* \*

(c) Valley Federal issued a new certificate of deposit ("New Certificate I") on September 17, 1979, in the principal amount of $740,000.00 with interest payable to the Petitioner at the rate of 11.75% per annum. \* \* \*

(d) [O]n or about April 2, 1980, Petitioner exchanged the New Certificate I together with accrued interest for a new certificate of deposit issued by Valley Federal ("New Certificate II") in the principal amount of $789,920.91 providing an interest rate of 17.5% per annum payable to petitioner. \* \* \*

(e) [O]n or about August 5, 1980, Petitioner surrendered the New Certificate II;

(f) Petitioner paid interest in the amount of $68,373.92 to Valley Federal in regard to this transaction. \* \* \*

(g) [O]n or about November 13, 1980, Petitioner closed out the Old Certificates.

9. By entering into these transactions, Petitioner earned $33,989.09 more than the amount of interest which would have been paid by Valley Federal on the Old Certificates as they existed prior to September 17, 1979.

10. The net interest, in the amount of $33,989.09, earned by Petitioner was determined as follows:

| | |
|---|---|
| Balance in New Certificate II at maturity | $839,395.46 |
| Plus amount drawn in October '79 for interest payment | 2,967.55 |
| Total principal and interest | 842,363.01 |
| Less: Principal amount of New Certificate I | 740,000.00 |
| Interest realized by Petitioner | 102,363.01 |
| Less: Interest paid by Petitioner pursuant to savings account loan agreements | 68,373.92 |
| Net interest earned by Petitioner | 33,989.09 |

The Commissioner determined that the new $740,000 certificate of deposit was purchased with borrowed money, that it was therefore "debt-financed [income-producing] property" (sec. 514(b)(1)), and that accordingly, pursuant to section 512(b)(4), the $102,363 interest realized therefrom (and from its successor, certificate II) was subject to the tax imposed by section 511 on "unrelated business taxable income." The Commissioner allowed petitioner a deduction

850

under section 514(a)(2) and (3) for the $68,374[3] interest petitioner had paid Valley Federal pursuant to the savings account loans. He also allowed petitioner the "specific deduction" of $1,000 provided by section 512(b)(12). Pertinent code provisions appear in the margin.[4] We sustain the Commissioner's determination.

[3]Both the $68,374 interest paid and $102,363 interest received figures in the deficiency determination had been rounded to the nearest dollar.

[4]SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS.

(a) CHARITABLE, ETC., ORGANIZATIONS TAXABLE AT CORPORATION RATES.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a tax computed as provided in section 11. In making such computation for purposes of this section, the term "taxable income" as used in section 11 shall be read as "unrelated business taxable income."

(2) ORGANIZATIONS SUBJECT TO TAX.—

(A) ORGANIZATIONS DESCRIBED IN SECTIONS 401(A) AND 501(C).—The tax imposed by paragraph (1) shall apply in the case of any organization * * * which is exempt * * * from taxation under this subtitle by reason of section 501(a).

SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) DEFINITION.—For purposes of this title—

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business * * * computed with the modifications provided in subsection (b).

\*        \*        \*        \*        \*        \*        \*

(b) MODIFICATIONS.— The modifications referred to in subsection (a) are the following:

(1) There shall be excluded all dividends, interest, payments with respect to securities loans (as defined in section 512(a)(5)), and annuities, and all deductions directly connected with such income.

\*        \*        \*        \*        \*        \*        \*

(4) Notwithstanding paragraph (1), (2), (3), or (5), in the case of debt-financed property (as defined in section 514) there shall be included, as an item of gross income derived from an unrelated trade or business, the amount ascertained under section 514(a)(1), and there shall be allowed, as a deduction, the amount ascertained under section 514(a)(2).

\*        \*        \*        \*        \*        \*        \*

(12) * * * there shall be allowed a specific deduction of $1,000. * * *

SEC. 514. UNRELATED DEBT-FINANCED INCOME.

(a) UNRELATED DEBT-FINANCED INCOME AND DEDUCTIONS.—In computing under section 512 the unrelated business taxable income for any taxable year—

(1) PERCENTAGE OF INCOME TAKEN INTO ACCOUNT.—There shall be included with respect to each debt-financed property as an item of gross income derived from an unrelated trade or business an amount which is the same percentage (but not in excess of 100 percent) of the total gross income derived during the taxable year from or on account of such property as (A) the average acquisition indebtedness * * * for the taxable year with respect to the property is of (B) the average amount * * * of the adjusted basis of such property during the period it is held by the organization during such taxable year.

(2) PERCENTAGE OF DEDUCTIONS TAKEN INTO ACCOUNT.—There shall be allowed as a deduction with respect to each debt-financed property an amount determined by applying * * * the percentage derived under paragraph (1) to the sum determined under paragraph (3). * * *

(3) DEDUCTIONS ALLOWABLE.—The sum referred to in paragraph (2) is the sum of the deductions under this chapter which are directly connected with the debt-financed property or the income therefrom * * *

(b) DEFINITION OF DEBT-FINANCED PROPERTY.—

Although petitioner is an organization exempt from taxation by reason of sections 401(a) and 501(a), it is nevertheless subject to the tax imposed by section 511(a)(1) on all "unrelated business taxable income," as defined in section 512. Section 512(a)(1) defines "unrelated business taxable income" as "the gross income derived by any organization from any unrelated trade or business * * * computed with the modifications provided in subsection (b)." Section 512(b)(1) excludes "interest" from the definition of unrelated business taxable income, and the Commissioner has not sought to tax the interest realized by petitioner from the old certificates. However, to the extent relevant here, section 512(b)(4) provides that notwithstanding section 512(b)(1), interest derived from "debt-financed property," computed in accordance with section 514(a), will be included in unrelated business taxable income. The crucial issue here is whether the new certificates are "debt-financed property."

Section 514(b)(1) defines "debt-financed property" as "any property which is held to produce income and with respect to which there is an acquisition indebtedness." And section 514(c)(1)(A) provides that "the term 'acquisition indebtedness' means, with respect to any debt-financed property, the unpaid amount of—(A) the indebtedness incurred * * * in acquiring * * * such property." The present case falls squarely within these provisions.

The new $740,000 certificate of deposit was acquired entirely with the proceeds of the three loans in the amounts of $250,000, $295,000, and $195,000 taken out by petitioner on September 17, 1979, collateralized by its three old certificates of deposit. Clearly, the debts thus incurred by petitioner constituted "acquisition indebtedness" within the plain language of section 514(c). Accordingly, the new

---

(1) IN GENERAL.—For purposes of this section, the term "debt-financed property" means any property which is held to produce income and with respect to which there is an acquisition indebtedness (as defined in subsection (c)) at any time during the taxable year * * *

(c) ACQUISITION INDEBTEDNESS.—

(1) GENERAL RULE.—For purposes of this section, the term "acquisition indebtedness" means, with respect to any debt-financed property, the unpaid amount of—

(A) the indebtedness incurred by the organization in acquiring or improving such property;

$740,000 certificate of deposit (certificate I) and its successor (certificate II)[5] must be held to be "debt-financed property" within section 514(b)(1), the interest income from which, computed under section 514(a)(1),[6] is specifically required by section 512(b)(4) to be "included, as an item of gross income derived from an unrelated trade or business." Thus, the $102,363 interest realized by petitioner from the new certificates must be treated as unrelated business income, from which it is entitled to a deduction of $68,374 for the interest which it paid on the savings account loan agreements (sec. 514(a)(2) and (3)). The difference between these two figures ($33,989) is the net interest earned by petitioner on the new certificates and is therefore taxable as determined by the Commissioner.

Petitioner seeks escape from the inexorable result that thus follows from applying the foregoing statutory provisions on several grounds, to which we now turn our attention.

1. Petitioner contends that, notwithstanding the language of the statute requiring the taxation of debt-financed income, Congress did not intend "to cover transactions such as those under review." And it refers to a report of the House Ways and Means Committee showing that Congress was motivated by a desire to eliminate "the incentive for owners desiring to sell a business to exploit the tax exemption of nonprofit organizations." H. Rept. 91-413 (Part 1), at 46 (1969), 1969-3 C.B. 200, 230. See also S. Rept 91-552, at 62-63 (1969), 1969-3 C.B. 423, 464. These reports refer pointedly to the *"Clay Brown"* and *"University Hill Foundation"* cases (*Commissioner v. Brown*, 380 U.S. 563 (1965); *University Hill Foundation v. Commissioner*, 51 T.C.

---

[5]There is no dispute that certificate II stands on the same footing as certificate I. Petitioner's indebtedness to Valley Federal is also "acquisition indebtedness" with respect to the second new certificate. Under sec. 1.514(c)-1(a)(4), Income Tax Regs., when an organization exchanges property subject to an acquisition indebtedness, and acquires another property without retiring that indebtedness, the outstanding indebtedness is "acquisition indebtedness" with respect to the newly acquired property, provided that the newly acquired property is otherwise treated as debt-financed property, as is the case here.

[6]As a result of the computations called for by sec. 514(a)(1) and (2), 100 percent of the interest received by petitioner on the new certificates and 100 percent of the interest paid by it on the indebtedness which it incurred to acquire the new certificates are to be taken into account as gross income and deduction, respectively. Petitioner has not challenged the computations, nor has it proposed any different computations.

548 (1969), revd. 446 F.2d 701 (9th Cir. 1971)) as involving the type of situation about which Congress was concerned.

We quite agree that Congress was concerned with putting an end to the abuses reflected in *Clay Brown* and *University Hill.* But, although it focused on those particular abuses, the provisions which it enacted were couched in broader terms, and were not limited precisely to those situations. This is but another instance of Congress' going beyond the evil which it seeks to correct in closing a loophole. In the words of Judge Friendly in *Commissioner v. Pepsi-Cola Niagara Bottling Corp.,* 399 F.2d 390, 392 (2d Cir. 1968), "a legislature seeking to catch a particular abuse may find it necessary to cast a wider net." That this is the situation here is persuasively indicated by decisions in other cases, which, although involving facts wholly unlike *Clay Brown* and *University Hill,* nevertheless applied the provisions at issue here to include income from debt-financed property in taxable unrelated business taxable income. *Elliot Knitwear Profit Sharing Plan v. Commissioner,* 614 F.2d 347 (3d Cir. 1980), affg. 71 T.C. 765 (1979); *Ocean Cove Corp. Ret. Plan & Trust v. United States,* 657 F. Supp. 776 (S.D. Fla. 1987); *Alabama Cent. Credit Union v. United States,* 646 F. Supp. 1199 (N.D. Ala. 1986). We agree with the results reached in these cases, and hold that the provisions involved here are not limited merely to covering cases like *Clay Brown* and *University Hill.*

2. Petitioner next argues that in substance Valley Federal "simply paid [petitioner] * * * additional interest on the old certificates, and such interest is excluded from unrelated business income by section 512(b)(1) of the Code." Petitioner contends that unless the additional interest is treated as interest on the old certificates, "the transaction would have no rational business purpose because Valley Federal (as the lender) would be lending money to the Pension Fund at low rates of interest (10.125%–11.0%) so that the Pension Fund could deposit the same funds with Valley Federal and earn much higher rates (11.75%–17.5%)." Petitioner concludes that "In substance, Valley Federal simply found a means to pay a higher rate of interest on the Old Certificates owned by the Pension Fund."

Petitioner's argument regarding Valley Federal's lack of business purpose proves too much. The payment of additional interest directly on the old certificates beyond what Valley Federal was legally obligated to pay would not seem to have any more "rational business purpose" than the transaction actually carried out. We can only speculate as to why Valley Federal would be willing to pay such additional interest, either directly on the old certificates (assuming that it could legally do so), or indirectly by means of the transaction before us. Perhaps it was to keep petitioner as a depositor. Indeed, petitioner stated in its opening brief that "Valley Federal agreed to this in order to persuade the Pension Fund to leave its funds invested in the Old Certificates." Whatever the reason may have been, Valley Federal was bound to lose money regardless of the form of the transaction.

We reject petitioner's contention that the additional interest received on the new certificates should be treated as exempt interest on the old certificates. It is true that if Valley Federal had paid petitioner additional interest on the old certificates, assuming that it could legally have done so, such interest would not have been subject to the UBIT. Petitioner could likewise have avoided paying the UBIT if it had withdrawn the account balances in the old certificates (in amounts reflecting the required reductions of interest), and reinvested such net proceeds in a new certificate of deposit, either with Valley Federal or with another savings and loan association. Indeed, petitioner's assertion, referred to above, that Valley Federal wanted to keep petitioner as a depositor suggests that Valley Federal feared that petitioner might consider withdrawing its funds and taking them elsewhere. However, petitioner did not withdraw its funds. Instead, it borrowed money to purchase the new certificates, which fall into the definition of debt-financed property according to the Code, and petitioner is not now entitled to be treated as though it had taken some other course of action. We find applicable here the words of the Supreme Court in *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974):

while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his

choice, whether contemplated or not, [Citations omitted.] and may not enjoy the benefit of some other route he might have chosen to follow but did not.

We hold that the interest received by petitioner on the new certificates from Valley Federal was interest from debt-financed property subject to the tax on unrelated business income. As in *National Alfalfa,* it is irrelevant here that petitioner might have achieved substantially the same result with more favorable tax consequences by following a different route. The fact is that the route it actually followed involved the receipt of interest from the debt-financed new certificates upon which the Code explicitly imposes a tax.

3. Petitioner makes an alternative argument that "the additional payments received from Valley Federal fall within the definition of 'payments with respect to securities loans' excluded from unrelated business taxable income by section 512(b)(1)." It contends that the amounts in controversy were "payments with respect to securities loans," i.e., payments with respect to loans made with the old certificates as collateral. The argument is completely lacking in merit.

It is true that "payments with respect to securities loans," as defined in section 512(a)(5),[7] are not considered to

---

[7] SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.
(a) DEFINITION.—For purposes of this title—

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(5) DEFINITION OF PAYMENTS WITH RESPECT TO SECURITIES LOANS.—
(A) The term "payments with respect to securities loans" includes all amounts received in respect of a security (as defined in section 1236(c)) transferred by the owner to another person in a transaction to which section 1058 applies (whether or not title to the security remains in the name of the lender) including—
(i) amounts in respect of dividends, interest, or other distributions,
(ii) fees computed by reference to the period beginning with the transfer of securities by the owner and ending with the transfer of identical securities back to the transferor by the transferee and the fair market value of the security during such period,
(iii) income from collateral security for such loan, and
(iv) income from the investment of collateral security,
(B) Subparagraph (A) shall apply only with respect to securities transferred pursuant to an agreement between the transferor and the transferee which provides for—
(i) reasonable procedures to implement the obligation of the transferee to furnish to the transferor, for each business day during such period, collateral with a fair market value not less than the fair market value of the security at the close of business on the preceding business day,
(ii) termination of the loan by the transferor upon notice of not more than 5 business days, and

be paid with respect to debt-financed property and are therefore not subject to the unrelated business income tax. Sec. 514(a)(1),[8] (c)(8).[9] Congress exempted "payments with respect to securities loans" from the unrelated business income tax in order to encourage exempt organizations that owned securities to lend them to brokers. S. Rept. 95-762 (1978), 1978-2 C.B. 357, 359, 360. Congress believed that such loans would enable brokers to make timely delivery of such securities to purchasers, thereby having a favorable impact on the liquidity of securities markets. The limited scope of what Congress sought to achieve and the reasons therefor are clearly stated in the report of the Senate Finance Committee as follows (S. Rept. 95-762 (1978), 1978-2 C.B. 357, 359-360):

> In these transactions, an owner of securities "lends" the securities to a broker who uses them to make timely deliveries of securities to purchasers. * * *
>
> In a typical lending transaction involving stock, the lender receives from the borrower amounts equal to the dividends paid on the stock during the period of the loan. * * *
>
> Because of time delays which a broker may face in obtaining securities (from the seller or transfer agent) to deliver to a purchaser, brokers are frequently required to borrow securities from organizations and individuals with investment portfolios for use in completing these market transactions. It is generally thought to be desirable to encourage organizations and individuals with securities holdings to make the securities available for such loans since the greater the volume of securities available for loan the less frequently will brokers fail to deliver a security to a purchaser within the time required by the relevant market rules.
>
> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;
>
> The committee believes that it is not desirable to discourage [Fn. reference omitted.] exempt organizations and regulated investment companies from making their securities available for loans to brokers,

---

[8]See *supra* note 4.

[9]SEC. 514. UNRELATED DEBT-FINANCED INCOME.

 (c) ACQUISITION INDEBTEDNESS.—

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 (8) SECURITIES SUBJECT TO LOANS.—For purposes of this section—

  (A) payments with respect to securities loans (as defined in section 512(a)(5)) shall be deemed to be derived from the securities loaned and not from collateral security or the investment of collateral security from such loans, * * *

(iii) return to the transferor of securities identical to the transferred securities upon termination of the loan.

because making such loans of securities can have a favorable impact on the liquidity of securities markets. * * *

The transaction here at issue bears scant relationship to the type of transaction envisioned by Congress. Here, petitioner did not *lend* the old certificates to Valley Federal in order to facilitate the delivery of such certificates to a purchaser or for any other use that Valley Federal might make thereof. There was no *loan* of the old certificates. Instead, petitioner *pledged* the old certificates as collateral for a loan to itself. Indeed, the record does not show that Valley Federal possessed the right to take any action whatsoever with respect to the old certificates except hold them as collateral for the money petitioner borrowed to purchase the new certificates. There was thus no "loan" of the old certificates such as Congress intended when it enacted section 512(a)(5) and section 514(c)(8).

In view of the clear inapplicability of section 512(a)(5) to petitioner's transaction with Valley Federal, we need not consider whether petitioner has failed to meet certain requirements set forth in section 512(a)(5).[10] To be sure, we are convinced that the old certificates were securities within the meaning of section 1236(c), as required by section 512(a)(5)(A), and we are reasonably content to infer the existence of an agreement complying with section 1058(b), which is similarly required by section 512(a)(5)(A). However, we have serious doubts whether the requirements of section 512(a)(5)(B)(i) and (ii) are satisfied. But, as just indicated, we need not enter these troubled waters.

Petitioner has also contended in its reply brief that the failure of the Commissioner's opening brief to discuss issues raised by petitioner's so-called trial memorandum must be treated as a concession on the merits of those issues, citing only *Stringer v. Commissioner*, 84 T.C. 693 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986), and in effect a concession of the entire case. However, the Government's opening brief does in fact make out an affirmative case for treating the interest on the new debt-financed certificates as unrelated business taxable income. But it is quite true that the Government's opening brief does not discuss petitioner's pretrial defensive conten-

---

[10]See *supra* note 7.

tions that the income in question was exempt from tax by reason of section 512(b)(1), either because it was in substance merely "additional interest" on the old certificates, or because it represented "payments with respect to securities loans." Nevertheless, when petitioner renewed those contentions in its opening brief, the Government responded to them in its reply brief.

This case differs sharply from *Stringer,* where the offending party had "filed no brief whatsoever," 84 T.C. at 703, as well as from *Klein v. Commissioner,* 6 B.T.A. 617 (1927), relied upon in *Stringer,* where the same was true. We find *Stringer* inapplicable here. In any event, failure to discuss a point does not necessarily mean that it is being conceded. Cf. *Marcus v. Commissioner,* 22 T.C. 824, 832 (1954); *Bissell v. Commissioner,* 23 B.T.A. 572, 574 (1931). The matter is at most within the discretion of the Court, and we refuse to exercise our discretion here against the Commissioner, whose opening brief addressed the central issue in the case and whose reply brief responded to the other issues presented in petitioner's opening brief. We find that the Government has not conceded the case, as argued in effect by petitioner.

*Decision will be entered for the respondent.*