T.C. Memo. 1996-253


UNITED STATES TAX COURT


AUSTIN B. EWELL, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16900-93.                    Filed May 30, 1996.


<u>George F. Belyea</u>, for petitioner.

<u>Lloyd T. Silberzweig</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined that petitioner has a deficiency in Federal income tax of $33,513 for 1987.  After concessions, we must decide the following:

1.   Whether various payments made by petitioner to and on behalf of his former spouse from March 27 to December 19, 1987, were alimony under section 71(b)(1).  We hold that they were not

because petitioner and his former spouse first had a divorce or separation instrument on December 19, 1987.

2. Whether petitioner may deduct $72,024 for interest and $10,727 for taxes that he paid, on behalf of his former spouse, as petitioner contends; $10,002, as respondent contends; or some other amount. We hold that he may deduct a portion of these expenses equal to the portion he proved he paid with his separate funds.

3. Whether petitioner may deduct $6,326 for business use of his Jeep Cherokee. We hold that he may not.

Section references are to the Internal Revenue Code in effect for the year in issue. Unless otherwise stated, Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. <u>Petitioner</u>

Petitioner lived in Fresno, California, when he filed his petition. He is a lawyer. He represented public water districts and some farmers and ranchers. He used the cash receipts and disbursements method of accounting.

B. <u>Real Property Belonging to Petitioner and His Former Spouse</u>

In 1987, petitioner and his former spouse jointly owned the following property:

1. 19605 Auberry Road, Clovis, Cal.--587 acres, residence, buildings, cattle grazing land.

2. Avenue 13 ½ between Roads 35 and 36, Madera County, Cal.--20 acres of citrus trees.

3. 34711 Avenue 14, Madera County, Cal.--residence, buildings, and 30 acres of citrus trees and kiwi vines.

4. Millerton Road, Fresno, Cal.--386 acres of cattle grazing land.

5. Millerton Road (Forman Ranch), Fresno, Cal.--40 acres of cattle grazing land.

6. Pittman Hill Road, Fresno County, Cal.--a 50-percent interest in 160 acres of grazing land.

7. 40008 Oakwoods Lane, Shaver Lake, Cal.--rental residence.

8. 6264 N. Van Ness Boulevard, Fresno, Cal.--residence

9. Zenobia Road, Rural Route 3, Wakeman, Ohio--a one-third interest in 72 acres with a residence and other buildings.

10. Zenobia Road (Lone Elm Farms), Rural Route 3, Wakeman, Ohio--a 50-percent interest in 210 acres with a residence and other buildings.

Petitioner and his former spouse were jointly liable for the mortgages and property taxes on their jointly owned property.

Petitioner's former spouse held a 100-percent interest in lot 752, tract 3230, Tehachapi, Cal.  Petitioner held a 27.084-percent interest in 12 Plover Circle, Watsonville, Cal.

C.  Petitioner's Separation From His Former Spouse

Petitioner and his former spouse separated on March 27, 1987.  In April 1987, petitioner's former spouse gave him a written list of her expenses.

Petitioner's former wife was admitted to a psychiatric hospital in April and released in May 1987.  During that time, petitioner's father-in-law told petitioner to preserve the community assets, to maintain the farming and business properties, and to keep the community payments current. Petitioner's father-in-law was a judge on the California Court of Appeals and a partner with petitioner and petitioner's former spouse on some ranches.

D.  Petitioner's Bank Accounts, Income, and Payments

1.  Bank Accounts

From March 27 to December 31, 1987, petitioner had five bank accounts (account Nos. 062-118-2706, 062-118-2714, 062-118-4024, 062-118-9611, and 062-119-0725).  On March 27, 1987, petitioner and his former spouse had $67,611 of community funds in the first three of those bank accounts.

2.   Community Income

Petitioner and his former spouse received $77,866 in community income from March 27 to December 31, 1987, in addition to the $67,611 of community funds that they had when they separated.  Their community funds totaled $145,477 from March 27 to December 31, 1987.  Their community funds were insufficient to pay community obligations during that time.

3.   Petitioner's Separate Funds

Petitioner deposited at least $146,019 of his separate funds in their joint checking accounts.  He provided about $20,000 per month from his salary.  Those funds were available to pay their postseparation community obligations in 1987.  Petitioner spent $172,484 of his separate funds to pay community expenses from March 27, 1987, to May 8, 1989.

4.   Petitioner's Payments to and on Behalf of His Former Spouse

In May 1987, petitioner began to pay about $3,700 per month to support his former spouse.  He made no payments to his former spouse from December 19 to December 31, 1987.

From March 27 to December 31, 1987, petitioner paid $4,287.27 of the lease expenses for his former spouse's car and paid mortgage interest of $144,048, mortgage principal of $61,541, and property taxes of $21,454 related to property he owned jointly with his former spouse.  From April 1 to

December 31, 1987, petitioner paid his former spouse's 50 percent share of farming expenses ($8,818) and rental expenses ($6,859).

In 1987, petitioner paid $8,560 for accounting fees to prepare his and his former spouse's 1986 joint income tax return. On December 31, 1987, petitioner paid the California Franchise Tax Board $5,248 for his and his former spouse's 1986 State taxes.

E.   Negotiations Between Family Law Attorneys Regarding Petitioner's Payments to and on Behalf of His Former Spouse

On August 13, 1987, James B. Preston (Preston), counsel to petitioner's former spouse, wrote a letter to Donald Magarian (Magarian), petitioner's divorce counsel, stating in pertinent part:

> As temporary arrangements we would propose the following temporary orders:
> 1.  Joint legal and physical custody of the minor children, as arranged between the parties.
>
> 2.  Each party maintain the furniture, fixtures, appliances and vehicles in their respective possession.
>
> 3.  Each party restrained from disposing of community or separate assets.
>
> 4.  Family support of $4,000 per month.
>
> 5.  Personal restraining orders against harassment by either party against the other party, family members and friends.
>
> 6.  Mr. Ewell continue to maintain Mrs. Ewell and the minor children on major medical/health and vehicle insurance, and any non-covered medical, dental, psychological and medication be paid by Mr. Ewell.

7. Mr. Ewell continue to maintain life insurance in current amounts with Mrs. Ewell and the children as primary beneficiaries.

8. Mr. Ewell pay the outstanding credit accounts.

9. Mr. Ewell advance attorney fees of $5,000 toward Mrs. Ewell's attorney fees, plus whatever our accountant may require as a retainer.

Please review and if satisfactory, I will prepare a formal order.

Additionally, once the Order is prepared, I would request my accountants be given access to the financial records of the parties.

On August 28, 1987, Magarian wrote Preston a letter stating as follows:

I have received your letter dated August 13, 1987 and have had the opportunity to review it with Mr. Ewell. After my discussion with Mr. Ewell, it was brought to my attention that both Mr. Ewell and his wife feel it would be beneficial for them to go to joint counselling before any major expenses regarding the legal aspects of the dissolution of marriage take place. It appears that the parties would desire to maintain the status quo at this time.

With the foregoing in mind, I am going to address the nine points you raised in your letter for a temporary agreement as follows:

1. The custodial arrangement would be acceptable pending the parties attending joint counselling with a psycologist [sic] that they can agree upon.

2. Acceptable.

3. Acceptable, except in the ordinary course of business.

4. Mr. Ewell would continue to take care of the Wife and children's needs as he has been doing for the past few months which appears to be acceptable to the Wife at this point in time.

5.  I do not know the urgency of an immediate restraining order, however, if your client feels it is necessary at this time, obviously, Mr. Ewell will comply.

6.  Acceptable, except that psychological and medication be controlled by some type of dollar amount.

7.  Acceptable.

8.  Acceptable, however, if there is going to be an order, we will have to reserve jurisdiction regarding reimbursement to Mr. Ewell.

9.  Mr. Ewell is well aware of the law that would require him to pay to you reasonable attorney fees for this case.  After some discussion, he feels that at this point since hopefully, there will be no legal activity, that he would be willing to pay to you $1,000.00 on account and then we can discuss further attorneys fees depending on what the future of this case has in store at that time.  We can also come to some type of conclusion of how much an accountant would need.  I am sure that will be no problem at the time when the issues are before us.

After you review this letter, please contact me as I would like to get your thoughts on the matter.

Robert Stringham (Stringham) succeeded a Mr. Hicks, not otherwise described in the record, who had succeeded Preston.  On November 3, 1987, Stringham wrote Magarian a letter that included the following:

Kristine Ewell has called me to tell me that while Mr. Ewell had agreed to increase support from $3,700.00 per month to $4,000.00 per month, he has instead, in the last two payments, reduced the support by $350.00 per payment, down to $3,000.00 per month.

We propose in behalf of Mrs. Ewell that we stipulate to a temporary order providing for child support of $600.00 per month per child and spousal support of $2,800.00 per month.  Child support and spousal support proposed to be payable in semi-monthly installments on

the 1st and 15th of each month commencing November 1, 1987.

We would like to have a partial payment of account of fees and costs at this time of $2,500.00.

Since Mrs. Ewell is in need of these funds, we look forward to hearing from you within the next week in the hope that a hearing can be avoided.

F.  <u>Temporary Stipulation and Order Re Child Custody and Joint Arrangement</u>

On December 18 and 19, 1987, the parties signed a Temporary Stipulation and Order Re Child Custody and Joint Arrangement, Family Support, Attorney Fees and Other Orders.  The Superior Court of California for Fresno County filed it on or about December 23.  It provided in part:

> IT IS FURTHER ORDERED that Respondent/Husband shall pay to Petitioner/Wife the sum of $2,100.00 per month support, commencing December 15, 1987, payable $1,050 on the 15th and $1,050 on the __, and continuing __ day of each and every month thereafter until Wife ___ dies, Husband dies, or further order of the court. In regard to these payments, time shall be of the essence.  The court shall reserve jurisdiction over whether these payments shall be charged in whole, or part, to Respondent/Husband's separate property, or the community

(NOTE:  Blanks indicate illegible parts of the copy of the document in evidence.)

It also required petitioner to:

> keep current the obligations of the community to the best of his ability until such time as the liquidity of the community estate is known upon presentation of an accounting by Respondent/Husband, and one-half of any such payments from Respondent/Husband's separate property shall be reimbursed to him by the community. The Court shall reserve jurisdiction to determine

whether reimbursement being sought by Respondent/Husband is a benefit to the community or to his separate property, or whether community property asset had a use value which would have an affect [sic] on reimbursement.

Petitioner's $1,650 payment to his former spouse on December 16, 1987, included $1,050 for alimony and $600 for child support.

## G. Petitioner's Jeep Cherokee

In 1987, petitioner leased a 1987 four-wheel-drive Jeep Cherokee (Jeep) that he used for commuting to work, his law practice, farming, ranching, and rental businesses, and for personal use. He also had a 1985 Audi. Petitioner paid $6,326 to lease and operate the Jeep in 1987. He did not have any records showing how he used the Jeep in 1987.

## H. Bankruptcy of Petitioner's Former Spouse

On July 1, 1988, petitioner's former spouse filed a petition in bankruptcy with the U.S. Bankruptcy Court, Case No. 188-02583-A-11. Petitioner claimed that he was entitled to receive reimbursement of $86,000 from her bankruptcy estate. The superior court which had jurisdiction over petitioner's divorce approved his claim, but his former spouse disputed it. Petitioner's former spouse appealed to the U.S. Court of Appeals for the Ninth Circuit.

A trustee was appointed in the bankruptcy case. The bankruptcy estate did not pay petitioner. As of the date of

trial, petitioner had not been reimbursed, and there was little or nothing left in the estate for petitioner or his former spouse. It is highly unlikely that petitioner will be reimbursed by his former spouse's bankruptcy estate.

## OPINION

A. Whether Petitioner and His Former Spouse Had a Written Separation Agreement Before December 19, 1987

### 1. Parties' Contentions

Petitioner contends that he may deduct as alimony support payments he made to and on behalf of his former spouse from August 27, to December 19, 1987.[1] He argues that a written support agreement existed on August 27, 1987. He contends that his former spouse's list of expenses, his claimed oral agreement to pay her $3,700 per month, the August 1987 exchange of letters between the family law attorneys, and notations petitioner wrote on checks constitute a written agreement for purposes of section 71(b)(2)(A).

Respondent contends that there was no written support agreement before December 19, 1987. On that date the court with jurisdiction over the parties' divorce signed the stipulated judgment. Respondent contends that petitioner's payments from August 27 to December 19, 1987, are not alimony, except

---

[1] Petitioner concedes that $13,581 he paid to his former spouse from Mar. 27 to Aug. 27, 1987, is not alimony.

respondent concedes that $1,050 that petitioner paid to his former spouse on December 16, 1987 was alimony.

2.   Written Separation Agreement Requirement

A taxpayer may deduct alimony or separate maintenance payments.  Sec. 215(a).  Alimony is any payment in cash if, among other requirements, it is received by (or on behalf of) a spouse under a divorce or separation instrument.  Sec. 71(b)(1)(A). A divorce or separation instrument is:  (a) A decree of divorce or separate maintenance or a written instrument incident to the decree; (b) a written separation agreement; or (c) a decree requiring a spouse to pay for the support or maintenance of the other spouse.  Sec. 71(b)(2).  No decree was in effect when petitioner made the payments at issue.  Thus, we must decide whether there was a written separation agreement under section 71(b)(2) before December 19, 1987.

The term "written separation agreement" is not defined by section 71(b)(2), its legislative history, or the Commissioner's regulations.  Bogard v. Commissioner, 59 T.C. 97, 100 (1972).  A written separation agreement is a clear, written statement of the terms of support for separated parties.  Id. at 101.  It must be a writing that constitutes an agreement.  Grant v. Commissioner, 84 T.C. 809, 823 (1985), affd. without published opinion 809 F.2d 260 (4th Cir. 1986).

3.    Whether Petitioner and His Former Spouse Had a Written Separation Agreement Before December 19, 1987

Petitioner and his former spouse separated on March 27, 1987.  Respondent contends that we should not believe petitioner's testimony that his former spouse gave him a list of her expenses which totaled about $3,700 per month which he agreed to pay.  Respondent points out that petitioner did not provide respondent or the Court with a copy of the list but gives no other reason that we should disbelieve petitioner.  Petitioner's claim is consistent with the fact that he in fact paid those amounts in the months after April 1987.  We accept petitioner's testimony that his former spouse gave him a written list of her expenses and that he told her that he would pay those amounts.

Petitioner contends that his oral agreement is part of a written separation agreement.  We disagree; an agreement must be written for purposes of section 71(b)(2).  Sec. 71(b)(2); Grant v. Commissioner, supra; see Gordon v. Commissioner, 70 T.C. 525, 529 (1978) (interpreting similar language in section 71(a)(1)).

The family law attorneys for petitioner and his former spouse conducted negotiations relating to the terms of a separation agreement from August to November 1987, but they did not reach an agreement.  On December 19, 1987, the family law attorneys signed a stipulated judgment.  The stipulated judgment required petitioner to pay alimony of $2,100 per month and child support of $1,200 per month, and to pay community obligations

subject to his right to be reimbursed for one-half of the payments he made with his separate funds.

Petitioner argues that the written list of expenses his former spouse gave him, the letters exchanged by the attorneys, and notations petitioner claims he made on checks he issued, considered together, constitute a written separation agreement. We disagree. An agreement requires mutual assent or a meeting of the minds. Kronish v. Commissioner, 90 T.C. 684, 693 (1988). Letters which do not show that there was a meeting of the minds are not a written separation agreement under section 71(b)(2). Grant v. Commissioner, supra; Estate of Hill v. Commissioner, 59 T.C. 846, 856-857 (1973). There was no agreement reached in the letters between the family law attorneys. The letters show only that there was a negotiation. Preston made nine proposals, including family support of $4,000 per month, in his letter dated August 13, 1987. Magarian said two provisions were acceptable, two were conditionally acceptable, and five were unacceptable. Magarian rejected Preston's proposal that petitioner pay family support of $4,000 per month.

Petitioner contends that he noted on each of his checks that the payment was for support and that those check notations are a part of the written separation agreement. We disagree. The checks are not in evidence. Even if they were, the fact that

petitioner made a notation on a check does not show that he agreed to provide support.

Petitioner points out that he paid support after the exchange of letters. However, the fact that he made payments does not show that there was a written agreement; on the contrary, the letters themselves show that there was not.

We conclude that petitioner's former spouse's list of expenses, negotiation letters between the family law attorneys, check notations, and the fact that petitioner provided support are not a written separation agreement for purposes of sections 71(b)(2) and 215. Thus, payments that petitioner made before the stipulated judgment was entered on December 19, 1987, are not alimony.[2]

B.  <u>Whether Petitioner May Deduct $72,024 for Interest and $10,727 for Taxes as His Former Spouse's Share of Business Expenses</u>

1.  <u>Parties' Contentions and Background</u>

Petitioner contends that he may deduct his payment of his former spouse's share of interest ($72,024) and taxes ($10,727) for business properties that they owned jointly because he used his separate funds to pay those expenses.

---

[2] In light of our conclusion, we need not decide respondent's contention that we lack jurisdiction to decide whether petitioner may deduct some of these items because he did not claim them as a deduction on his 1987 income tax return or in the petition in this case.

Respondent contends that petitioner did not show that they were deductible expenses or that he used his separate funds to pay them. Respondent also contends that petitioner may not deduct those amounts because he had substantial community funds available when he paid them. Respondent concedes that petitioner may deduct his one-half share of those amounts, which we treat as a concession that the interest and taxes at issue would have been deductible if paid by petitioner's former spouse.

2. Whether the Possibility That Petitioner May Be Reimbursed Bars Him From Deducting His Payment of His Former Spouse's Share of Mortgage Interest and Property Taxes

Respondent contends that petitioner may not deduct his payments of his former spouse's share of mortgage interest and property taxes because he has a right to be reimbursed by her. Respondent contends that Levy v. Commissioner, 212 F.2d 552, 554 (5th Cir. 1954), affg. a Memorandum Opinion of this Court dated March 9, 1953; Estate of Boyd v. Commissioner, 28 T.C. 564, 566-567 (1957); and Conte v. Commissioner, T.C. Memo. 1981-571, affd. 722 F.2d 727 (2d Cir. 1983), support this contention. We disagree.

Petitioner concedes that he had a right to be reimbursed for community expenses that he paid with his separate funds from March 27 to December 31, 1987. However, none of the cases respondent relies on involved mortgage interest and real property taxes for which the taxpayer was jointly and severally liable.

The payments were for repairs, maintenance, and capital improvements for jointly owned property paid entirely by one of the owners.  In contrast to this case, the Commissioner conceded in Conte that the taxpayer could deduct real estate taxes and mortgage interest to the extent he paid them because he was jointly and severally liable for those obligations.  Conte v. Commissioner, supra.

Unlike this case, in none of those cases did the court find that reimbursement would be highly unlikely.  In Estate of Boyd and Conte we did not consider the probability that the taxpayers would be reimbursed.  In Levy, the court found that the taxpayers did not show that they could not have enforced their right to be reimbursed.  Levy v. Commissioner, supra at 554.

Petitioner and his former spouse are jointly and severally liable for the mortgage interest and property taxes at issue. Petitioner could lose the properties if the mortgage interest and property taxes were not paid.  Taxpayers may deduct the payment of expenses for which they are not liable if necessary to protect their property interests.  Dunn & McCarthy, Inc. v. Commissioner, 139 F.2d 242, 244 (2d Cir. 1943); Waring Prods. Corp. v. Commissioner, 27 T.C. 921, 929-930 (1957); Catholic News Publishing Co. v. Commissioner, 10 T.C. 73, 77 (1948).

We conclude that petitioner may deduct the amount he paid for his former spouse's share of mortgage interest and real

estate taxes to the extent he has proven that he paid it with his separate funds.

3. Tracing of Community Funds and Petitioner's Separate Funds

The parties agree that petitioner may use either the family expenditure or direct tracing method to show the amount, if any, of separate funds that he used to the pay community debts that he seeks to deduct.

Under the family expenditure method, total community expenditures are subtracted from total community funds to show whether any community funds remain. Under the direct tracing method, each check from and each deposit to a particular account is listed in chronological order, and the balances in the account are computed after each transaction. A separate transaction account balance is computed for the community property, the husband's separate property, and the wife's separate property for each account.

4. Whether Exhibit 9 Is Admissible

Petitioner's Exhibit 9 purports to use the direct tracing method to show that he used his separate funds to pay the community debts.[3] Exhibit 9 is a worksheet consisting of eight

_____

[3] George Belyea, who represented petitioner in this case, briefly testified to authenticate worksheets (including Exh. 9) with which the parties had been working for several months to trace petitioner's community and separate funds. Respondent objected to his testimony and the admission of the exhibits that

(continued...)

pages, each with 15 columns.  In Exhibit 9, George Belyea (Belyea), who represented petitioner in this case, used Lotus 1-2-3 software to analyze 600 to 700 checking account transactions.

The contents of voluminous writings which cannot conveniently be examined in court may be presented in summary form if the writings are made available for examination or copying, or both, by other parties at a reasonable time and place.  Fed. R. Evid. 1006.

Respondent contends that Exhibit 9 is not admissible because it is an improper summary under rule 1006 of the Federal Rules of Evidence and because, in violation of the Court's standing pretrial order, it was not exhanged 15 days ahead of the first day of the trial session.  Respondent contends that petitioner did not provide a copy of Exhibit 9 until 2 days before the trial session began, in violation of the Court's standing pretrial order, which requires the parties to exchange documents at least 15 days before the trial session begins.

---

[3](...continued)
he sought to authenticate on the grounds that his testimony was barred by Rule 24(f).  Respondent's counsel conceded that he was not surprised by what Belyea said.  We overruled respondent's objection, but invited the parties to argue this issue on brief. Respondent did not do so, which we treat as respondent's concession.  See Stringer v. Commissioner, 84 T.C. 693, 708 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986); cf. Kern Co. Elec. Pension Fund v. Commissioner, 96 T.C. 845, 858 (1991), affd. without published opinion 988 F.2d 120 (9th Cir. 1993); Marcus v. Commissioner, 22 T.C. 824, 832 (1954).

Petitioner contends that Belyea gave respondent substantially similar versions of Exhibit 9 3 months before trial. Respondent's counsel said that he saw prior versions of Exhibit 9 more than 15 days before the trial session began, but did not see a version of Exhibit 9 with the columns "COMMUNITY CHECKING ACCOUNT BALANCE" and "COMBINED CHECKING ACCOUNT BALANCE" until February 4, 1995.

Petitioner contends that the data in Exhibit 9 is taken from Exhibits 13-M and 10. We disagree. Exhibits 13-M and 10 are not the source of the data in columns 11 ("COMMUNITY CHECKING ACCOUNT BALANCE"), 13 ("A B EWELL SALARY & EXPENSE REIMBURSEMENT"), 14 ("A B EWELL SEPARATE PROPERTY CHECKING ACCT BALANCE"), and 15 ("COMBINED CHECKING ACCOUNT BALANCE") of Exhibit 9. Belyea said that he gave respondent's counsel the data on which he based those columns 3 months before trial. However, at trial, Belyea could not identify the data on which he based columns 11, 13, 14, and 15, which included the columns that respondent's counsel identified.

Exhibit 10 is apparently the source for column 7 of Exhibit 9, entitled "TRANS FROM COMMUNITY SAVINGS ACCOUNT", but not for any other columns. We conclude that columns 1 to 6, 8 to 10, and 12 of Exhibit 9 are based on Exhibit 13-M, and that column 7 of Exhibit 9 is based on Exhibit 10. The rest of Exhibit 9 is not

based on other evidence. Thus, columns 1-10 and 12 of Exhibit 9 are admissible, but columns 11, 13, 14, and 15 are not.

5. Whether Exhibit 9 Shows That Petitioner Used His Separate Funds To Pay Business Interest and Taxes

a. Direct Tracing Method

Petitioner contends that Exhibit 9 shows under the direct tracing method that he used his separate funds to pay business interest and taxes. We disagree.

Petitioner contends that Exhibit 9 shows that, after issuance of check No. 1008 on April 1, 1987, there were no community funds in the checking account, the community balance remained in deficit for the rest of 1987, and by December 31, 1987, he had used $193,967.44 of his separate funds to pay for the community deficit. Exhibit 9 without columns 11, 13, 14, and 15 does not establish that there were no community funds in the accounts on April 1, 1987, or that petitioner and his former spouse had insufficient community funds to pay community expenses after April 1, 1987. It does not show all of the community funds on deposit when petitioner and his former spouse separated. Exhibit 9 does not include the $67,611 of community funds petitioner and his former spouse had when they separated on March 27, 1987.

Even if all of Exhibit 9 were admitted, it only shows a beginning community checking account balance of $1,496.69 and no other community funds before March 31, 1987. Petitioner has not

identified the source of the $1,496.69 or any of the beginning balances in Exhibit 9.  Exhibit 9 does not show that they spent more than $67,611 by April 1, 1987.  Exhibit 9 does not properly apply the direct tracing method.  It does not directly trace petitioner's separate funds through the commingled accounts to the specific payments that he seeks to deduct.  Exhibit 9 does not list the balance of each account and the balance of petitioner's separate funds computed after each transaction as required by the direct tracing method.  It appears that Belyea combined petitioner's five accounts on Exhibit 9.  Exhibit 9 does not directly trace each transaction in each account and show the community and separate fund balance after each transaction. Thus, even if Exhibit 9 were fully admitted, petitioner has not proven that the community funds were in deficit after April 1, 1987.

We conclude that petitioner has not shown that he used his separate funds to pay his former spouse's share of mortgage interest and property taxes for their business properties through the direct tracing method.

> b.  Family Expenditure Method

Respondent concedes that the family expenditure method shows that petitioner used some of his separate funds to pay mortgage interest and property taxes.  Respondent concedes that petitioner

may deduct $10,002.  Petitioner contends that he may deduct $82,751.

Petitioner paid mortgage interest of $144,048, mortgage principal of $61,541, and property taxes of $21,454 (a total of $227,043) from March 27 to December 31, 1987.  During that time he had $145,477 of community funds.  Community funds in an account in which community and separate funds are commingled are presumed to have been used to pay community obligations.  See v. See, 64 Cal. 2d 778, 783, 415 P.2d 776, 779 (1966); Hicks v. Hicks, 211 Cal. App. 2d 144, 154, 27 Cal. Rptr. 307, 314 (1962).  Applying that presumption here, respondent concedes that petitioner used $81,566 ($227,043 - $145,477) of his separate funds to pay community obligations which included mortgage principal, interest, and property taxes.  To compute the amount of separate and community funds used for principal, interest, and taxes, the parties, in the Rule 155 computations, should compute the amount of separate and community funds used to pay principal, interest, and property taxes by using the ratio of $81,566 (separate funds) over $145,477 (community funds) (56 percent).  Thus, petitioner may deduct 56 percent of his former spouse's share of mortgage interest and property taxes that he paid before January 1, 1988.

6.   Whether Petitioner May Deduct Amounts He Paid With His
     Separate Funds If Community Funds Were Available

Respondent contends that petitioner may not deduct amounts that he paid for his former spouse's share of community business expenses with his separate funds because there were community funds available in a separate savings account.  We disagree.

The direct tracing method does not require all community funds to be exhausted first.  Under the direct tracing method, a party can prove that he or she used his or her separate funds even if other community funds are available.  Our acceptance of respondent's contention would, in effect, eliminate the direct tracing method and require the parties to use the family expenditure method.  Respondent stipulated that either of the two methods may be used under California law to trace whether a party used separate funds to pay particular expenditures.  Thus, respondent's position is contrary to respondent's stipulation that allows parties to use the direct tracing and family expenditure methods to trace funds.

Respondent provides no persuasive authority for this contention.  Respondent contends that Bozek v. Commissioner, T.C. Memo. 1986-37; Porter v. Commissioner, T.C. Memo. 1979-104; Kaonis v. Commissioner, T.C. Memo. 1978-184, affd. without published opinion 639 F.2d 788 (9th Cir. 1981); and Powell v. Commissioner, T.C. Memo. 1967-32, hold that spouses filing separate income tax returns may deduct only one-half of the

community expenses, even if one spouse pays all of them, unless there is an allocation agreement.  However, those cases do not control here because in them, in contrast to this case, we did not decide that the taxpayer could not prove that he or she used separate funds to pay community obligations where community funds were available.[4]

We conclude that the fact that community funds were not exhausted does not preclude petitioner from deducting the amounts that he paid for community obligations with his separate property.

### 7.  Conclusion

We conclude that petitioner may deduct 56 percent of his former spouse's share of mortgage interest and property taxes that he paid in 1987.

### C.  Jeep Expenses

Petitioner contends that he may deduct as a business expense $6,326 which he paid in 1987 to lease and operate his Jeep.[5]

---

[4] Two cases that respondent cites, Powell v. Commissioner, T.C. Memo. 1967-32, and Finney v. Commissioner, T.C. Memo. 1976-329, hold that a taxpayer may not deduct more than the taxpayer's share of a community obligation if the taxpayer did not establish that the taxpayer used separate funds to pay the community obligation.  In Finney, we held that the taxpayer, who owned property with his wife as tenants by the entirety, could deduct all of the mortgage interest payment because he made the payments with his separate funds.

[5] Petitioner deducted $6,918 on Schedule A of his 1987 return for employee business expenses relating to his 1987 Jeep.

Respondent contends that petitioner: (1) Did not substantiate that he paid those amounts, (2) used the Jeep to commute to his office and for other personal uses, and (3) had no records of the business use of the Jeep. Petitioner contends that he is not required to have automobile use logs because he used the Jeep almost exclusively for his farming and rental activities, and his business usage of his Audi exceeds his personal use of the Jeep.

A taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162. However, automobile expenses are subject to special substantiation rules. The Jeep is listed property under section 280F(d)(4)(A)(i) because it is a passenger automobile. A taxpayer may not deduct automobile expenses unless he or she substantiates by adequate records or sufficient evidence corroborating the taxpayer's own statement the amount, time and place, and business purpose of the expense. Sec. 274(d)(4).

Petitioner has not substantiated the purpose, time, or place of travel for any of the Jeep expenses as required under section 274(d)(4). He did not have a log or records of the mileage, dates, locations, or business purpose of the trips he took in the Jeep.

We disagree with petitioner's contention that he may count business use of his Audi to offset personal use of the Jeep. Petitioner offers no authority to support this argument, and we

know of none.  Also, petitioner has not provided any logs or other evidence of his use of the Audi.

The substantiation requirements do not apply to a qualified nonpersonal use vehicle.  Sec. 274(d).  A qualified nonpersonal use vehicle is "any vehicle which, by reason of its nature, is not likely to be used more than a de minimis amount for personal purposes."  Sec. 274(i).  Petitioner contends that the Jeep is a qualified nonpersonal use vehicle.  We disagree.  Sec. 1.274-5T(k)(2)(ii), Temporary Income Tax Regs., 50 Fed. Reg. 46033 (Nov. 6, 1985) (partial list of qualified nonpersonal use vehicles, including clearly marked police and fire vehicles, ambulances, hearses, vehicles designed to carry cargo with a gross weight of more than 14,000 pounds, bucket trucks, cement mixers, combines, cranes, derricks, delivery trucks with seating only for the driver, dump trucks, flatbed trucks, forklifts, refrigerated trucks, school buses, tractors, and other special purpose farm vehicles.)  A Jeep is not like these specialized-use vehicles.

We conclude that petitioner may not deduct amounts for the Jeep in excess of that allowed by respondent.

To reflect concessions and the foregoing,

> An order will be issued denying
> in part respondent's motion to strike
> the testimony of George F. Belyea and

related documents and decision will be entered under Rule 155.